PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 94-4878

D. C. Docket No. 92-8010-CIV-SH

BETH ANN FARAGHER, NANCY EWANCHEW,

Plaintiffs-Appellants-
Cross-Appellees,

versus

CITY OF BOCA RATON, a political subdivision
of the State of Florida,

Defendant-Appellee-
Cross-Appellant,

BILL TERRY, DAVID SILVERMAN,

Defendants-Appellees.

Appeals from the United States District Court
for the Southern District of Florida

(April 15, 1997)
(As Amended April 28, 1997)[*]

Before HATCHETT, Chief Judge, TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges, DYER[**] and KRAVITCH[***], Senior Circuit Judges.

COX, Circuit Judge:

---

*Judge Barkett's dissent, in which Chief Judge Hatchett and Senior Circuit Judge Kravitch join, is amended. All other opinions remain the same.

[**] Senior U.S. Circuit Judge Dyer elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

[***] Senior U.S. Circuit Judge Kravitch was in regular active service when this matter was originally submitted but has taken senior status effective January 1, 1997. She elected to participate in this decision pursuant to 28 U.S.C. § 46(c)(1996).

## I.  Facts[1]

Beth Ann Faragher worked as an ocean lifeguard for the City of Boca Raton, Florida (City), in the Parks and Recreation Department's Marine Safety Section.  The City employed Faragher intermittently from September 1985 until June 1990.  During these five years, Bill Terry and David Silverman acted as supervisors of the ocean lifeguards, Terry as Chief of the Marine Safety Section and Silverman as a Marine Safety lieutenant and then captain.  Terry had the authority to supervise all aspects of the lifeguards' work assignments; to give oral reprimands and place reports of disciplinary actions in personnel files; and to interview and select new lifeguards, subject to approval by higher management.  Silverman supervised the lifeguards' daily duties, including designating work assignments and supervising physical fitness routines.

The Marine Safety Section was organized according to a clear chain of command.  Lifeguards reported to Marine Safety lieutenants, and above them to captains; the captains reported directly to the Chief of the Marine Safety Section, who was directly supervised by the Recreation Superintendent; the Recreation Superintendent reported to the Director of Parks and Recreation, who reported to the City Manager.  Lifeguards had little contact with City officials.  Marine Safety Headquarters was at the beach -- in a remote location, far away from City Hall.

---

[1]  The facts are essentially drawn from the district court's Finding of Fact.

Marine Safety Chief Terry subjected Faragher and another lifeguard, Nancy Ewanchew, to uninvited and offensive touching, and lieutenant Silverman made offensive comments and gestures to both Faragher and Ewanchew. In particular, Faragher testified that over the course of her five years of employment Terry touched her shoulders or waist on a number of occasions, patted her thigh once in April 1990, and slapped her on the rear end. Ewanchew testified about two specific incidents where Terry touched her in a sexually offensive manner. However, neither Faragher nor Ewanchew complained to Parks and Recreation Department management about Terry's and Silverman's conduct while they were employed with the City or when they resigned. They both did speak about Terry's and Silverman's conduct with one of their supervisors, Marine Safety lieutenant and Training Captain Robert Gordon. In fact, most of the female lifeguards complained to Gordon about Silverman's language and conduct. The lifeguards did not speak with Gordon on a subordinate to superior basis; they spoke with him as a friend whom they held in high repute. Gordon did not report the complaints to his supervisor, Terry, or to any other City official.

Ewanchew resigned from her position with the City in April of 1989, saying that she was leaving because she had found a better job. Faragher resigned in June of 1990 to attend law school. In April of 1990, Ewanchew wrote a letter to the City's Director of Personnel complaining that she and other female lifeguards had been sexually harassed by Terry and Silverman while she was employed by the City. The City did not know about Terry's and Silverman's

3

conduct until receiving Ewanchew's letter. The City then investigated Ewanchew's complaint and determined that Terry and Silverman had engaged in some inappropriate conduct. The City reprimanded and disciplined them both.

## II.  Procedural Background

In 1992, Faragher sued the City, Terry, and Silverman. Faragher sued the City for sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I). Faragher sued Terry and Silverman for sexual harassment under 42 U.S.C. § 1983 (Counts II and III). Faragher also asserted pendent state law claims, suing Terry for battery (Counts IV and V) and the City for negligent retention and supervision of Terry (Counts VI and VII). The district court held a non-jury trial on all claims.

The district court entered judgment for Faragher on her Title VII claim against the City, awarding her $1 in nominal damages.[2] The court held that Terry's and Silverman's offensive conduct was sufficiently severe and pervasive to alter the conditions of Faragher's employment by creating a hostile work environment. The court held that the City was directly liable for Terry's and Silverman's conduct under agency principles based on Terry's and Silverman's supervisory authority and the overall workplace

---

[2]  The district court awarded Faragher $10,000 in compensatory damages on her § 1983 claim against Terry and Silverman, jointly and severally, and $500 in punitive damages on her battery claim against Terry. Additionally, the district court entered judgment for Ewanchew on her battery claim against Terry and awarded her $35,000 in compensatory damages and $2,000 in punitive damages.

4

structure. In addition, the court held that the City was indirectly liable for Terry's and Silverman's offensive conduct because the conduct was severe and pervasive and supported "an inference of knowledge, or constructive knowledge, on the part of the City regarding Terry's and Silverman's sexual harassment." (R.6-166 at 23.)

Faragher appealed and the City cross appealed. A panel of this court reversed the district court's judgment for Faragher on her Title VII sexual harassment claim against the City, but affirmed the district court's judgment in all other respects. Faragher v. City of Boca Raton, 76 F.3d 1155 (11th Cir. 1996). That panel opinion was vacated and rehearing en banc was granted. Faragher v. City of Boca Raton, 83 F.3d 1346 (11th Cir. 1996).

### III. Issues on Appeal

We address two issues in this opinion:[3] First, whether the City may be liable under Title VII for Terry's and Silverman's hostile environment sexual harassment of Faragher, regardless of its actual or constructive knowledge of that harassment; and second, whether the City knew or should have known of Terry's and Silverman's hostile environment harassment of Faragher.

---

[3] The parties present additional issues that do not merit further discussion. We affirm as to those issues. See 11th Cir. R. 36-1.

5

IV.  Standards of Review

We review the district court's finding of fact under the clearly erroneous standard of review.  Pullman-Standard v. Swint, 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789 (1982).  We review the district court's conclusions of law and its application of law to facts *de novo*.  Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc., 3 F.3d 1472, 1475 (11th Cir. 1993), cert. denied, __ U.S. __, 115 S.Ct. 56 (1994).


V.  Contentions of the Parties

Faragher contends that Terry's and Silverman's positions as top lifeguard commanders make them prototypical agents of the City. Faragher argues that this status, combined with Terry's and Silverman's conduct, makes the City liable for hostile environment sexual harassment.  In addition, Faragher argues that the harassment was so pervasive that the City should be charged with constructive knowledge of Terry's and Silverman's conduct.

The City argues that it cannot be held liable under agency principles for Terry's and Silverman's conduct because there is no evidence which supports a finding either that Terry and Silverman were acting within the scope of their authority in harassing Faragher, or that they were aided in accomplishing the harassment by the existence of their agency relationships with the City.  The City further contends that the evidence is insufficient to support the trial court's finding that the City had constructive notice of Terry's and Silverman's conduct.

VI.  Discussion

A.  <u>The City is not indirectly liable for Terry's and Silverman's conduct.</u>

This case requires us to accommodate the Supreme Court's mandate in <u>Meritor Savings Bank v. Vinson</u> that federal courts use traditional agency principles when deciding hostile environment sexual harassment cases, but simultaneously "place some limits on the acts of employees for which employers under Title VII are to be held responsible."  477 U.S. 57, 72, 106 S.Ct. 2399, 2408 (1986).

Because the Eleventh and all other circuits employ agency principles in the realm of hostile environment sexual harassment, this opinion utilizes the language of traditional agency case law.  Under this approach, direct liability and indirect liability are distinct concepts and form the only possible bases for an employer's liability.  An employer is directly liable for hostile environment sexual harassment if it knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action.  See <u>Steele v. Offshore Shipbuilding, Inc.</u>, 867 F.2d 1311, 1316 (11th Cir. 1989); <u>Henson v. City of Dundee</u>, 682 F.2d 897, 905.[4]  Under this theory of direct liability, the City can be held liable for its own negligence or recklessness, but not for the conduct of its

_____

[4] These cases refer to this type of liability as "indirect" liability.  However, as courts long have done outside the realm of Title VII sexual harassment analyses, we are now marrying the common law agency terms to their proper, traditional common law principles.  This alteration can promote ease of reference to the underlying common law agency principles.

7

supervisors or employees.

In contrast, an employer is indirectly, or vicariously, liable for the wrongful conduct of its agent, whether or not the employer knew or should have known about the agent's wrongful act. Generally, an employer may be indirectly liable for hostile environment sexual harassment by a superior: (1) if the harassment occurs within the scope of the superior's employment; (2) if the employer assigns performance of a non-delegable duty to a supervisor and an employee is injured because of the supervisor's failure to carry out that duty; or (3) if there is an agency relationship which aids the supervisor's ability or opportunity to harass his subordinate. See Restatement (Second) of Agency § 219(1), (2)(c), (2)(d).

Subsequent to Meritor, the circuits differ on the appropriate test to apply in a hostile work environment case involving sexual harassment of an employee by the employer's supervisor. See, e.g., Kauffman v. Allied Signal, 970 F.2d 178, 184 (6th Cir. 1992)(holding that the plaintiff must establish that a supervisor's harassment was within the scope of his employment and that the employer failed to respond adequately and effectively when it learned of the harassment); Paroline v. Unisys Corp., 879 F.2d 100, 104, 106-07 (4th Cir. 1989), vacated in part, 900 F.2d 27 (4th Cir. 1990)(holding that the proper inquiry is whether the individual defendant served in a supervisory position in which he exercised "significant control over the plaintiff's hiring, firing or conditions of employment;" and, if not, whether employer had actual

8

or constructive knowledge of the existence of a hostile work environment and took no prompt and adequate remedial steps); <u>Hicks v. Gates Rubber Co.</u>, 833 F.2d 1406, 1418 (10th Cir. 1987)(holding that employer liability could arise under the principles of Restatement § 219(2) if: (1) the employer was negligent or reckless; or (2) the employee relied on the supervisor's apparent authority; or (3) the supervisor was aided in his harassment by the existence of the agency relationship); <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1486 (3d Cir. 1990)(holding that the plaintiff must prove that management level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action); and <u>EEOC v. Hacienda Hotel</u>, 881 F.2d 1504, 1515-16 (9th Cir. 1989)(holding that "employers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known").

This Circuit has concluded that in a pure hostile environment case, a supervisor's harassing conduct is typically outside the scope of his employment. <u>See</u> <u>Steele</u>, 867 F.2d at 1311 (11th Cir. 1989); <u>accord</u> <u>Andrade v. Mayfair Management, Inc.</u>, 88 F.3d 258, 261 (4th Cir. 1996)(holding that illegal sexual harassment is an illegitimate corporate activity, beyond the scope of the supervisor's employment). We noted that:

> Strict liability is illogical in a pure hostile environment setting. In a hostile environment case, no *quid pro quo* exists. The supervisor does not act as the company; the supervisor acts outside "the scope of actual

9

or apparent authority to hire, fire, discipline, or promote."

Steele, 867 F.2d at 1316 (quoting Henson, 682 F.2d at 910). Thus, as Meritor teaches, employers are not automatically liable for hostile environment sexual harassment by their supervisors or employees.

Instead, this circuit has articulated two agency principles under which an employer may be held indirectly,[5] or vicariously, liable for hostile environment sexual harassment: (1) when a harasser is acting within the scope of his employment in perpetrating the harassment, see Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1558 (11th Cir. 1987)(citing Restatement (Second) of Agency § 219(1));[6] and (2) when a harasser is acting outside the scope of his employment, but is aided in accomplishing the harassment by the existence of the agency relationship. Sparks, 830 F.2d at 1559-60 (citing Restatement (Second) of Agency § 219(2)(d)). Faragher's claim against the City fails on either theory.

First, neither Terry nor Silverman were acting within the scope of their employment when they perpetrated the harassment. Under well-established common law agency rules, an agent is not acting within the scope of his employment when he is "going on a

---

[5] The cases that developed these theories of liability referred to them as avenues for "direct" employer liability. For the reasons stated in footnote 2, we use the label "indirect" liability.

[6] This scenario admittedly will be rare after Steele.

10

frolic of his own." Joel v. Morrison, 6 C. & P. 501, 172 Eng.Rep. 1338 (1834)(first recorded use of this phrase); see also Spencer v. Assurance Co. of America, 39 F.3d 1146, 1149 (11th Cir. 1994)(interpreting Florida law). In this scenario, the agent steps outside of his employment to do some act for himself which is not connected to his employer's business. See William L. Prosser, § 70 Law of Torts at 461 (4th ed. 1982). If the agent has no intention to perform any service for his employer, but instead seeks only to further some personal end, then the act is not within the scope of his employment. See, e.g., Bennett v. United States, 102 F.3d 486, 489 (11th Cir. 1996)(holding that victim of accidental shooting in army barracks could not hold the United States liable under Georgia respondeat superior principles because employee had undertaken an act purely personal in nature and thus outside the scope of his employment); Spencer, 39 F.3d at 1150 (holding that in order for an employee's conduct to be within the scope of his employment Florida law requires that the conduct (1) must have been the kind for which the employee was employed to perform; (2) must have occurred within the time and space limits of his employment; and (3) must have been activated at least in part by a purpose to serve the employment); Restatement (Second) of Agency § 235; see also Restatement (Second) of Agency § 236.[7]

---

[7] The commentary to §§ 235 and 236 makes it clear that scope-of-employment determinations must turn on whether the employee's act was intended to benefit the employer. This "intent" can be discerned from circumstantial evidence which indicates that the employee's act, whether "part" of, or "incidental" to, the employment was in some way authorized by the employer. See Comment a, § 235, Comment a, § 236. Thus, "[i]f ... the servant does the

11

In contrast, if it becomes apparent that the act was the agent's way of accomplishing some authorized purpose, then the master cannot avoid liability, even if he has given specific, detailed and emphatic instructions to the contrary.  See Restatement (Second) of Agency § 230; Prosser, supra, at 461.

The contours of this same analysis have guided courts adjudicating agency issues in intentional tort cases.  Generally, an employer is held liable for any intentional tort committed by an agent where the purpose of the tort is wholly or in part to further the employer's business.  Restatement (Second) of Agency § 245; Prosser, supra, at 464.  Once again, however, if the agent acts from purely personal motives, he is usually considered to have departed from his employment and his employer is not liable.  Id. at 465.

The harassment here consisted of offensive comments, gestures and touching.  However, the nature of Terry's and Silverman's acts and comments towards Faragher does not support a finding that they were acting within the scope of their employment in subjecting Faragher to offensive language, gestures, and touching.  Indeed, there is no evidence that Terry and Silverman harassed Faragher in order to perform any service for the City, or that they were either explicitly or implicitly authorized by the City to engage in such

---

very act directed, or does the kind of act which he is authorized to perform within working hours and at an authorized place, there is an inference that he is acting within the scope of employment." Comment a, § 235.  See also Bennett, 102 F.3d at 494 (noting that Georgia scope-of-employment doctrine focuses on whether the employee has acted to benefit his employer's purpose.)

12

harassment. This case provides the archetypical example of employees stepping outside of the scope of their employment and seeking to further personal ends. Consequently, under this theory of vicarious liability, the City cannot be liable for Terry's and Silverman's harassing conduct.

Second, neither Terry nor Silverman were aided in accomplishing the harassment by the existence of their agency relationship with the City. See Sparks, 830 F.2d at 1559-60 (citing Restatement (Second) of Agency § 219(2)(d)). In one sense, a supervisor is always aided in accomplishing hostile environment sexual harassment by the existence of an agency relationship with his employer because his responsibilities include close proximity to and regular contact with the victim. Gary v. Long, 59 F.3d 1391, 1397 (D.C. Cir), cert. denied __ U.S. __, 116 S.Ct. 569 (1995). However, the common law rule does not use "aided" in such a broad sense. Rather, the employer is liable only if the harassment is accomplished by an instrumentality of the agency or through conduct associated with the agency status. Id.[8] In

---

[8] Gary cites, as an example of this type of conduct, Restatement (Second) of Agency § 219, comment e: "Thus a telegraph company may be held liable for a tort committed by a telegraph operator who sends a false telegraph message, as may the undisclosed principal of a store whose manager cheats a customer." Gary, 59 F.3d at 1397. The point is that in such cases,

[l]iability is based upon the fact that the agent's position facilitates the consummation of the [tort], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him. See Restatement § 219, comment e (citing § 261 in discussion of § 219(2)(d)).

13

Sparks, for example, the harasser used the authority delegated to him by the company to assist in the harassment: He repeatedly reminded the victim that he could fire her if she refused his advances. Sparks, 830 F.2d at 1560; see also Steele, 867 F.2d at 1317 (limiting holding of Sparks to situations involving both *quid pro quo* and hostile environment harassment).

No person threatened to fire or demote Faragher for refusing to accommodate Terry's and Silverman's harassing overtures. Moreover, the harassment cannot reasonably be viewed as conduct associated with Terry's and Silverman's status as agents of the City. See supra note 8. And, there is no evidence that either Terry or Silverman made any employment decisions based upon Faragher's response to their sexual overtures. See Karibian v. Columbia University, 14 F.3d 773, 780 (2nd Cir. 1994)(holding employer liable for hostile environment sexual harassment where supervisor capitalized upon his authority over plaintiff's employment to force plaintiff to endure prolonged, violent and demeaning sexual relationship).

Because Terry and Silverman were not acting within the line and scope of their employment in perpetrating the harassment against Faragher, and because Terry and Silverman were not aided in accomplishing the harassment by the existence of any agency relationship with the City, the district court erred in holding the City of Boca Raton vicariously liable for Terry's and Silverman's harassment of Faragher.

B. <u>The City is not directly liable for Terry's and Silverman's harassing conduct.</u>

The district court found that the City had no actual knowledge of the sexual harassment but had constructive knowledge because of the harassment's pervasiveness. The question of constructive knowledge is an issue of fact reviewed for clear error. <u>Reich v. Department of Conservation and Natural Resources, State of Ala.</u>, 28 F.3d 1076, 1082 (11th Cir. 1994).

The City contends that the district court's finding that the City had constructive notice of the harassment is clearly erroneous and, therefore, that the City may not be held directly liable for the harassment. Faragher responds that the district court's finding that the sexual harassment was severe and pervasive enough to infer the City's knowledge is not clearly erroneous.

An employer is directly liable for hostile work environment sexual harassment if the employer knew or should have known of the harassment and failed to take prompt remedial action. <u>Steele</u>, 867 F.2d at 1316; <u>Henson</u>, 682 F.2d at 905. A plaintiff can prove an employer's knowledge of harassment by showing she complained to higher management. <u>Huddleston v. Roger Dean Chevrolet, Inc.</u>, 845 F.2d 900, 904 (11th Cir. 1988). The district court found that Faragher did not complain to higher management at the City. While several lifeguards complained to lieutenant Gordon, the district court found that he did not rank as higher management in the City and, therefore, that notice to him should not be imputed to the

15

City.[9]

A plaintiff also can prove an employer's knowledge by showing that the harassment was pervasive enough to charge the employer with constructive knowledge. Huddleston, 845 F.2d at 904; Henson, 682 F.2d at 905. The district court believed that its finding that the conduct was sufficiently severe and pervasive to alter the conditions of Faragher's employment "supports an inference of knowledge, or constructive knowledge, on the part of the City regarding Terry's and Silverman's sexual harassment, making the City [directly] liable for such conduct." (R.6-166 at 23-24.) According to the court, the pervasiveness analysis applicable to finding that the work environment was abusive is the same as the analysis required to show the employer's knowledge.

We agree with the district court that the analyses are the same to the extent that a court must evaluate the totality of the circumstances both in determining whether the work environment was abusive and in determining whether the conduct was pervasive enough to put the employer on notice. But we do not agree with the district court's apparent belief that simply because conduct is pervasive enough to create an abusive work environment the employer should be charged with knowledge of the conduct. The question of notice to the employer is distinct from the question of the

---

[9]   In its discussion of the City's indirect liability for Terry's and Silverman's conduct the court held that Gordon's knowledge of Terry's and Silverman's conduct provides a basis for holding the City liable. This was error. Gordon did not receive that information as the City's agent; he received it as a friend held in high repute by his colleagues.

16

environment's abusiveness.  Thus, the district court erred to the extent that it conflated the two inquiries.[10]

There may be cases in which it is difficult to draw the line where conduct becomes so pervasive that the employer should have known about it.  But this is not such a case.  The district court expressly found that the City had no knowledge of Terry's and Silverman's conduct.  The district court did not find, nor has Faragher pointed to, any factual basis for concluding that the harassment was so pervasive that the City should have known of their conduct.  The evidence suggests that just the opposite is true.  The lifeguards were stationed at a remote location and had little contact with City officials.  The harassment itself occurred intermittently over a long period of time.  Faragher worked for the City mostly on a part-time and summer basis, and the district court's holding was premised upon a few, discrete instances of harassment.  Another lifeguard, Kelly Evans, was a friend of Faragher's, yet the two never discussed sexual harassment and there is no evidence that Ms. Evans was otherwise aware of Terry's and Silverman's harassing behavior towards Faragher.  And, as part of her duties as Recreation Superintendent, Sandy Dioli-Kumm occasionally counseled some of the lifeguards.  Ewanchew came to see Dioli-Kumm to discuss work-related issues on several different occasions but never mentioned anything about sexual harassment or

---

[10]     It does not follow in this case that because there was an abusive environment the City necessarily had constructive knowledge of Terry's and Silverman's harassment.  However, there may be other cases in which the same level of pervasiveness can support a finding both of hostile environment and constructive notice.

17

offensive words or touching by Terry or Silverman; nor is there any evidence that Dioli-Kumm was otherwise aware of such harassment.

Finally, the district court found that the confined space at the lifeguard headquarters building, along with the disproportionate ratio of female to male lifeguards, were in and of themselves conducive to a sort of camaraderie that might be considered "somewhat boisterous." Despite this, however, Ewanchew stated that the atmosphere in the locker room was generally respectful among members of a particular shift.

For the above reasons, the district court clearly erred in finding that the City's knowledge may be inferred from the fact that the conduct was pervasive enough to create an abusive work environment.[11] Thus, because there was no basis for imputing knowledge of the harassment to the City, and the district court having found that the City had no actual knowledge of the harassment, we hold that the City is not directly liable for Terry's and Silverman's harassment of Faragher.

## VII. CONCLUSION

We reverse the district court's judgment for Faragher on her Title VII sexual harassment claim against the City. In all other respects we affirm the district court's judgment.

AFFIRMED in part; REVERSED in part.

---

[11] There is some evidence that the City did not effectively disseminate among Marine Safety employees its sexual harassment policy. The district court did not find that the City would have known about the harassment if it had effectively disseminated this policy; and indeed, the record indicates that failure to disseminate this policy was not the reason why the City did not know about the harassment.

18

BARKETT, dissenting in part and concurring in part, in which HATCHETT, Chief Judge and KRAVITCH, Senior Circuit Judge, joins:

The question posed in this case explores the circumstances under which an employer can be liable for a supervisor-created hostile environment of sexual harassment. I believe the majority errs in concluding that the city is not liable under the circumstances presented here and misapplies the law in doing so. First, I believe that the majority fails to give appropriate consideration to the responsibility of an employer for the acts of its agents under traditional agency principles, and essentially limits liability to only employers who "knew or should have known" of the hostile environment. Second, even though the majority says that an employer's liability can be based on only constructive knowledge, its analysis effectively requires actual knowledge "of high city officials" - a test at odds with traditional principles of "imputed" corporate knowledge.[12]

In <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57, 106 S.Ct. 2399 (1989),  although the Supreme Court declined to extend strict liability to hostile environment sexual harassment, it likewise rejected rules which would insulate employers from liability absent actual or constructive notice. Instead, it simply directed courts to look to traditional agency principals to assess an employer's liability for hostile environment sexual harassment. <u>Id.</u> at 72-73,

---

[12]Additionally, the majority errs in  engaging  in <u>de</u> <u>novo</u> review of the district court's factual findings relating to constructive knowledge instead of reviewing for clear error.

19

106 S.Ct. at 2408.[13]  As does the majority, I will discuss these agency concepts in turn.

**"Direct Liability"[14]**

The majority acknowledges employer liability for supervisor-created hostile environment sexual harassment if the employer knew or should have known of the harassment and failed to take prompt remedial action. <u>Vance v. Southern Bell Tel. & Tel. Co.</u>, 863 F.2d 1503, 1512 (11th Cir. 1989).  Under our case law, an inference of

---

[13] Common law principles of agency are embodied in § 219 of the Restatement (Second) of Agency (1958)[hereinafter "Restatement"]. Section 219 establishes five different theories for assigning liability to employers for the actions of their employees:

> (1)  A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
>
> (2)  A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
>> (a)  the master intended the conduct or the consequences, or
>>
>> (b)  the master was negligent or reckless, or
>>
>> (c)  the conduct violated a non-delegable duty of the master, or
>>
>> (d)  the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

[14] I am using "direct" liability in the same manner as the majority. Under the Restatement, this theory arises under § 219(2)(b), which provides: " (2)  A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:  (b)  the master was negligent or reckless." Employer negligence in this context is defined as "failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." <u>Hirschfeld v. New Mexico Corrections Dep't.</u>, 916 F.2d 572, 577 (10th Cir. 1990); <u>Kauffman v. Allied Signal, Inc.</u>, 970 F.2d 178, 185 (6th Cir.), <u>cert.</u> <u>denied</u>, 113 S.Ct. 831 (1992).

20

constructive knowledge on the part of the employer can be supported by a finding of pervasive harassment. <u>Huddleston v. Roger Dean Chevrolet, Inc.</u>, 845 F.2d 990, 904 (11th Cir. 1988) (explaining that "[p]laintiff can show that the employer had knowledge by "demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises"); <u>Vance</u>, 863 F.2d at 1512 (stating that a plaintiff "can prove that the employer knew of the harassment by showing . . . that the harassment was pervasive enough to charge the employer with constructive knowledge").

After a non-jury trial, the district court in this case found that Terry's and Silverman's conduct was "sufficiently severe or pervasive" to constitute hostile environment sexual harassment. The court then ruled that "[t]his finding of pervasiveness supports an inference of knowledge, or constructive knowledge, on the part of the City regarding Terry's and Silverman's sexual harassment . . . ." The determination of constructive notice is based on factual findings which this court will not overturn unless they are clearly erroneous. See <u>Reich v. Dep't of Conservation and Natural Resources</u>, 28 F.3d 1076, (11th Cir. 1994) (citing <u>Lewis v. Federal Prison Indus., Inc</u>., 786 F.2d 1537, 1543-45 (11th Cir. 1986) (reversing as clearly erroneous a district court's finding with respect to whether management knew or should have known that remedial action taken to eliminate age discrimination was ineffective)); <u>Vance</u>, 863 F.2d at 1512 (referring to the issue of constructive knowledge of sexual harassment as a "factual determination"). Nonetheless, the majority essentially engages in

21

<u>de</u> <u>novo</u> review, substituting the trier of fact's assessment of the record with its own. <u>See</u> Majority Op. at 16.

The majority also purports to find legal error: "...[S]imply because conduct is pervasive enough to create an abusive work environment an employer should [not] be charged with knowledge of the conduct. The question of notice to the employer is distinct from the question of the environment's abusiveness. Thus the district court erred to the extent that it conflated the two inquiries." Majority Op. at 16. However, there is no support in either logic or the law for such a proposition. The majority can cite to no case which holds that the same level of pervasiveness cannot support the same finding of a hostile environment and constructive notice. In fact, <u>Vance</u> states, "Just as the determination of whether conduct is sufficiently 'severe and pervasive' to constitute actionable harassment requires evaluation of the totality of the circumstances, the fact finder [in determining constructive knowledge] must examine the evidence in the same manner. Again, the egregiousness, as well as the number of the incidents, is plainly relevant." <u>Id</u>. at 1513. Moreover, the majority seems to collapse the two distinct inquiries of actual knowledge and constructive knowledge into one, effectively requiring actual knowledge before imposing liability. For example, in rejecting the district court's finding of constructive notice the majority notes that "the City had no knowledge" of Terry's and Silverman's conduct; that there was no "factual basis for concluding that the City should have known of their conduct"; that

22

the lifeguards "were stationed at a remote location and had little contact with City officials"; that Faragher never told her friend who also was a lifeguard; and that the Recreation superintendent was never told about the sexual harassment. Majority Op. at 16-17. These factors inform an actual knowledge inquiry, not a constructive knowledge inquiry.

For an employer to be charged with knowledge, it is clearly not necessary for the head of the company, its president, or the chairman of the board to have known of the harassment. Indeed, generally the ultimate head or governing board does not have actual knowledge of the action. The very point of ascribing knowledge on a constructive basis is to recognize that liability can be imputed even when the employer has not been "told," i.e., even when there is no actual knowledge. The relevant inquiry for constructive knowledge is what the employer should have known in the exercise of reasonable care. Hirschfeld v. New Mexico Corrections Dep't., 916 F.2d 572, 577 (10th Cir. 1990). Thus, an employer cannot insulate itself from liability by abandoning its employees in a remote location to be supervised by someone who makes their work lives miserable by offensive touching and an atmosphere of sexually offensive comments, suggestions and innuendo.

Terry was the Chief and supervisor of the lifeguard station at which Faragher worked. He clearly had the notice necessary to impute knowledge, and therefore liability, to the City. Under the circumstances presented here, the district court, after hearing and evaluating the evidence, correctly applied the law to the facts of

23

this case and did not commit clear error in  finding that the pervasiveness of the harassment supported an inference of constructive notice on the part of the City.

**"Indirect Liability "[15]**

I also think the majority errs in effectively confining liability to instances where an employer has actual or constructive knowledge. The very purpose of agency is to establish an employer's liability specifically for acts of which it has no knowledge.  As Justice Joseph Story explains, a principal

> is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances, or misfeasances, and omissions of duty, of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them.

Joseph Story, Commentaries on the Law of Agency § 452, at 536-37 (5th ed. 1857).  This rule of holding a principal liable for the acts of its agent is based on "the consideration that it is the principal who makes it possible for the agent to inflict the injury." 3 Am. Jur. 2d Agency § 270 (1986).  The record here establishes that Terry and Silverman were agents of the City acting within the scope of their employment [16] and were aided in

---

[15] I am using "indirect" liability in the same manner as the majority, that is, according to the principles of agency found in §§ 219-37 of the Restatement.

[16] § 219 (1) provides, " A master is subject to liability for the torts of his servants committed while acting in the scope of their employment."

accomplishing the harassment by the existence of an agency relationship.[17]

The majority erroneously assumes that because employers rarely, if ever, expressly authorize supervisors to act in a way that would create a sexually hostile environment, harassment by a supervisor would never fall "within the scope of his employment." The majority erroneously states that "[t]his Circuit has concluded that in a pure hostile environment case, a supervisor's harassing conduct is typically outside the scope of his employment." Majority Op. at 9. However, the language from Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir. 1989) that the majority cites in support of this proposition merely reiterates Meritor's rule against applying strict liability in hostile environment harassment cases. To the extent that the majority relies on cases from other circuits for the holding that harassment constitutes behavior outside the scope of employment,[18] such cases serve as poor guides since they misconstrue the agency law to which Meritor directs us. The Restatement clearly states that "an act, although forbidden, or done in a forbidden manner, may be within the scope of employment." Restatement § 230. The proper inquiry in

---

[17]  § 219(2)(d) provides, "A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless . . .  the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."

[18]  See e.g. Andrade v. Mayfair Manag., Inc., 88 F.3d 258, 261 (4th Cir. 1996) (stating that "illegal sexual harassment is an illegitimate corporate activity, beyond the scope of supervisors' employment").

25

determining if the agent's actions are "within the scope of employment" is not whether the objectionable conduct was authorized, but whether the conduct is of "the same general nature as that authorized, or incidental to the conduct authorized." Restatement § 229. In making that determination, courts should consider, among other things, when the action took place, where it took place, whether it was foreseeable, the purpose of the action, whether it served the principal, and the extent of the departure from normal methods or results. Id.; see also, Yates v. AVCO Corp., 819 F.2d 630 (6th Cir. 1987) (finding that supervisor acted "within scope of employment" in harassing subordinate where harassment took place at the office, during working hours and was carried out by someone with the authority to hire, fire, promote and discipline the plaintiffs); Kauffman v. Allied Signal, Inc., 970 F.2d 178 (6th Cir.) (explaining that a relevant factor in determining if supervisor was acting "within the scope of employment" in harassing subordinate is whether the supervisor had "significant input" into personnel decisions), cert. denied, 113 S.Ct. 831 (1992).

Indeed, I believe that hostile environment sexual harassment is analogous to the Restatement's well-known paradigm, which explains that "a chauffeur, driving on an errand for his master, who knowingly drives on the left-hand side of the street or exceeds the speed limit, is still acting within the scope of employment." Restatement § 231 cmt. a. The act of speeding has not been authorized by the employer, but the journey has clearly been

26

undertaken within the scope of the chauffeur's employment. Likewise, a pervasively hostile work environment of sexual harassment is never (one would hope) authorized, but the supervisor is clearly charged with maintaining a productive, safe work environment. The supervisor directs and controls the conduct of the employees, and the manner of doing so may inure to the employer's benefit or detriment, including subjecting the employer to Title VII liability. In hostile environment sexual harassment cases the supervisor, though not authorized to create a sexually hostile environment, uses his authority "to call [the victim] into his presence, to retain her in his presence over her objections, to use his responsibility to act as the voice of the employer to place her in a compromising position, and to take liberties with her personal privacy beyond the reach of a co-equal acquaintance, or a stranger." See David Benjamin Oppenheimer, <u>Exacerbating the Exasperating: Title VII Liability of Employers for Sexual Harassment Committed By Their Supervisors</u>, 81 Cornell L. Rev. 66, 88 (1995) ; <u>see also</u>, <u>Huddleston</u>, 845 F.2d at 904 (employer liable where supervisor required plaintiff to attend staff meetings where she was harassed, and he physically touched her while berating her for her job performance); <u>Tomka v. The Seiler Corp.</u>, 66 F.2d 1295 (2d Cir. 1995) (employer liable where supervisor required plaintiff to attend business dinner and encouraged alcohol consumption which led to her rape by supervisor and other employees).

Moreover, "[a]n act may be within the scope of employment although consciously criminal or tortious." Restatement § 231;

27

see also, Lyon v. Carey, 533 F.2d 649 (D.C. Cir. 1976) (employer liable where delivery person raped a woman to whom he was delivering furniture); Ira S. Bushy v. United States, 398 F.2d 167 (2d Cir. 1968) (government liable where drunken sailor's unauthorized acts caused ship to sink); Carr v. Wm. C. Crowell Co., 171 P.2d 5 (Cal. 1946) (employer liable where carpenter hit another employee in the head with a hammer); Samuels v. Southern Baptist Hospital, 594 So.2d 571 (La. Ct. App. 1992) (hospital liable where nurse's assistant raped a patient).

Notwithstanding these well-established principles, the majority writes that an act is not within the scope of employment where "the agent has no intention to perform any service for his employer, but instead seeks only to further some personal end." Majority Op. at 11. In support of this proposition, the majority cites Bennett v. United States, 102 F.3d 486 (11th Cir. 1996) which involved an off-duty soldier who accidentally shot a civilian with a privately owned handgun while socially visiting another soldier in the Army barracks. Id. at 487. This Court stated that the soldier's activities on the evening of the shooting "were unrelated to any employment relationship with the military, and were not undertaken to further his employer's business." Id. at 494. This conclusion, however, rested on facts very different from those before us. In Bennett, there was no dispute that the soldier was off-duty, and was visiting the barracks "for purely personal reasons unrelated to his responsibilities as a soldier," which failed "to bear even the faintest connection with his duties as an

28

employee of the United States Army." Id. at 490. Terry's and Silverman's harassment took place during work hours and at the work place. Most importantly, the soldier in Bennett was not performing **any** act on behalf of his employer when the shooting occurred, nor were his activities surrounding the shooting of "the same general nature as" or "incidental to" any authorized conduct. In the case before us, however, Terry and Silverman were charged with creating and maintaining a productive, safe work environment, while directing their employees in the performance of their duties. It is while they were engaged in their responsibilities that the harassment of Faragher occurred and, thus, was clearly "incidental to" authorized conduct.

The majority's use of Spencer v. Assurance Co. of America, 39 F.2d 1146 (11th Cir. 1994), is also inapposite. In Spencer this Court found that an employee, hired for road-paving, was not acting within the scope of employment when he committed an intentional battery while fighting "to protect his sister." There was nothing in the fight relating to the employee's work or the manner in which he was instructed to perform it. Indeed, the Court specifically recognized that

> this case lacks a sufficient nexus between the employee's job and his battery of another to raise even a jury question as to the scope of employment issue." Id. at 1149. The Court explicitly recognized that "under special circumstances, an employee's intentional battery of another may be said to have occurred within the employee's scope of employment. See, e.g., Forster v. Red Top Sedan Service, Inc., 257 So.2d 95 (Fla. 3d DCA 1972) (directed verdict in favor of employer reversed where employee bus driver forced plaintiff's car off the road and then assaulted and battered the car's occupants

29

after plaintiff allegedly delayed the employee from performing his job-related duties); <u>Columbia by the Sea, Inc. v. Petty</u>, 157 So.2d 190 (Fla. 2d DCA 1963) (jury question created as to the scope of employment question when maitre d' struck a customer after customer failed to pay his bill and called maitre d' a "bastard").

The majority also cites to Restatement §§ 235 and 236, arguing that in order to hold the employer liable, the employee must have intended to "serve the interests" of the employer. However, this is too narrow a reading of these sections, as under those provisions, an employer can also be held liable if there was an intent "to perform it as a part of or incident to a service on account of which he is employed." Applying all of the foregoing principles to the facts of this case, I believe the City of Boca Raton is liable under § 219(1) for the hostile environment created by Terry and Silverman.

Alternatively, I believe the City is liable in this case under § 219(2)(d), which holds a principal liable for the acts of an agent when the agent is aided in accomplishing the tort by the existence of the agency relationship. <u>See</u> Restatement § 219(2)(d). As with analysis under § 219(1), proper application of § 219(2)(d) requires courts to closely scrutinize the power structure within the workplace to determine the extent to which the particular agency relationship has empowered the supervisor to use or abuse his position to accomplish the harassment. <u>See</u> <u>Vance</u>, 863 F.2d at 1515 (degree of authority and overall structure of the workplace are relevant to agency analysis); <u>Sparks v. Pilot Freight Carriers, Inc</u>, 830 F.2d 1554, 1559 (11th Cir. 1987) (adopting E.E.O.C. reasoning that employer's delegation of authority empowered

30

supervisor to act). <u>See generally</u>, Oppenheimer, 81 Cornell L. Rev. at 89.

The record reveals that both Terry and Silverman were granted virtually unchecked authority over the work environment. In Terry's capacity as Marine Safety Chief, "[he] had the authority to supervise all aspects of the lifeguards' work assignments, to conduct counseling and oral reprimands and place reports of such disciplinary actions in the lifeguards' personnel files." Terry also interviewed and selected new lifeguards, subject to approval by higher management. Moreover, Terry held the highest management position in the Marine Safety Section and on the City's beaches. Thus, he was ultimately responsible for the general beach environment, including the public's safety, and as such, it was incumbent upon him to ensure optimal performance from the lifeguards. Silverman, as Marine Safety lieutenant, and then captain, supervised the "lifeguards' daily duties, including designation of the lifeguards' work assignments and staffing of shifts, and supervision of their physical fitness routines."

With respect to the City's involvement with the lifeguards, the court found that "the lifeguards' contacts with higher city officials . . . were almost non-existent," and the City admits that, "Marine Safety headquarters was located at the City beach and was thus physically remote from City Hall." The lifeguards operated under an extensive chain of command, with at least six levels of management between the lifeguards and the City Manager. Most importantly, although the City had a written sexual harassment

policy, that policy was never disseminated among Marine Safety Section employees, and in fact, supervisors were never told or made aware of the City's sexual harassment policy. Indeed, the district court explicitly found that any procedures that the City had in place to deal with sexual harassment were ineffectual because of the City's failure to disseminate those procedures.

In sum, Faragher was completely isolated from the City's higher management, and Terry and Silverman directly controlled and supervised all aspects of her day-to-day activities. Furthermore, it is clear that the City had divested itself of all responsibility for the social climate of the lifeguards' work environment, that Terry and Silverman essentially were given unfettered responsibility for and control over that environment, and that the lifeguards had no effective avenue of redress with the City. Thus, under Vance, Terry and Silverman were acting with the requisite amount of authority as agents to bind the City as principal. This conclusion is supported by the fact that the acts of harassment were undertaken during the time and at the place of work and were "incidental to" the broad range of tasks the supervisors were authorized to do, see Restatement § 229 (defining scope of employment), as well as by the fact that Terry and Silverman were aided in accomplishing these acts by the existence of the agency relationship.

For the foregoing reasons, I would hold the City liable for Terry's and Silverman's creation of a hostile work environment of sexual harassment.

32

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

With the exception of appellant Beth Ann Faragher's Title VII claim, I concur in the court's disposition of this case. As for that claim, I cannot join the court's opinion because I agree with the district court that Faragher's proof demonstrated that the City of Boca Raton violated Title VII by requiring her to work in a hostile environment. The court accepts as not clearly erroneous the district court's finding that hostility in the form of abusive sexual harassment was a condition of Faragher's employment, but it holds that the City is not liable under Title VII because the City had no "actual knowledge" of the sexual harassment and "there was no basis for imputing knowledge [of it] to the City." Ante at 17.[19] I disagree. Faragher's supervisor, Bill Terry, had knowledge of the harassment because he perpetrated the harassment. The City should be held liable for the sexual harassment Faragher

---

[19] I am confused by the court's use of the conjunction "and." To me, because the City is a corporation and must act through its agents, actual knowledge must be imputed knowledge. That is, information that an agent obtains in discharging his or her duties is imputed by operation of law to the corporation, thus giving the corporation actual knowledge of what the agent learned. Hence, when referring to a corporation, imputed knowledge is actual knowledge.

I am also confused by the court's conclusion that the City would be liable if it "knew or should have known" of the sexual harassment in question. This implies that the City could be held liable for simple negligence. A Title VII claimant, however, must establish that the employer intended the harassment. I believe that the court, in using this "knew or should have known" language, means that if a trier of fact could conclude from the evidence that the agent responsible for ensuring order in the workplace (including the prevention of severe and pervasive sexual harassment) knew that an employee was being subjected to a hostile environment, that knowledge would constitute the employer's knowledge.

33

experienced because it placed Terry in charge of Faragher's working environment and gave him the responsibility of maintaining order in the workplace.

I.

A.

Title VII of the Civil Rights Act of 1964, as amended, provides that

[i]t shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Title VII prohibits as a discriminatory condition of employment the employer's creation of an abusive working environment characterized by severe and pervasive sexual harassment. Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed. 2d 49 (1986). "A discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." Harris v. Forklift Systems, 510 U.S. 17, 22, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295 (1993). "[D]iscriminatory conduct . . . so severe or pervasive that it create[s] a work environment abusive to employees because of their . . . gender . . . . offends Title VII's broad rule of workplace equality." Id., 114

34

S.Ct. at 371.

For obvious reasons, most employers strive to maintain order in the workplace. Order enhances efficiency. For employers in the private sector, order enhances the potential for profit. For public employers, order enhances the image of officials who must stand for re-election and bureaucrats who report to them and seek job security. Disorder, the converse of order, prevents the workplace from operating at optimal efficiency. Sexual harassment that is severe and pervasive constitutes disorder. Hence, employers have an extra-legal incentive to prevent it. Title VII, because of the liability and associated costs it may impose, provides employers with an added, legal incentive to prevent this form of disorder.

There is always someone in charge of any workplace. Depending on the character of the business or the number of employees in the workplace, the designation of the person in charge may be explicit. Alternatively, the designation may be tacit. Unless the employer designates someone other than the person in charge of the workplace as the one responsible for maintaining order, I would hold that the person in charge of the workplace has the responsibility of preventing severe and pervasive sexual harassment.[20] I would hold

---

[20] This approach is consistent with the Supreme Court's directive in Meritor that, in determining which of the employer's agents or employees is responsible for preventing severe and pervasive harassment from permeating the workplace, "courts [must] look to agency principles for guidance," although "such common law principles may not be transferable in all their particulars to Title VII." 477 U.S. at 72, 106 S.Ct. at 2408. Title VII, as interpreted in Meritor, requires employers to take steps to ensure that sexual harassment does not permeate the

35

further that if the employer delegates to someone else the duty of policing the workplace for sexual harassment, the employer must make the designation unambiguously known to those laboring in the workplace; otherwise the designation would have no legal, or practical, effect.

B.

In the case at hand, the court does not dispute that Terry was in charge of the workplace.

As Chief of the Marine Safety Section, "Terry had the authority to supervise all aspects of the lifeguards' work assignments; to give oral reprimands and place reports of disciplinary actions in personnel files; and to interview and select new lifeguards, subject to approval by higher management." Ante at 2. The district court found that the City "had a written sexual harassment policy, [but failed] to disseminate said policy among Marine Safety Section employees," including Faragher. Faragher v. City of Boca Raton, 864 F. Supp. 1552, 1560 (S.D. Fla. 1994). Because the City neither communicated the policy to these employees nor identified the person to whom complaints of sexual harassment were to be made, the responsibility for implementing the policy in Faragher's

_____

workplace. To the extent that the application of common law agency principles frustrates Title VII's goal of eliminating such harassment -- by effectively relieving the employer of the responsibility of pursuing that goal -- those principles must yield. The court, however, in reaching today's decision, does not appear to have considered this point.

workplace necessarily fell to Terry.[21]  Because he was aware that Faragher was working in a sexually abusive environment and did nothing to correct the situation, I would hold the City liable for the injury she sustained.

## II.

As noted above, the City had a policy against sexual harassment in the workplace.  The City, however, did not communicate the policy to the employees of the Marine Safety Section or identify the person to whom complaints of sexual harassment were to be made.  Thus, the City effectively concealed from those employees the avenue for redress of grievances.  This concealment troubles me for three reasons.  First, I fear that the court's opinion dilutes the employer's duty under Title VII to maintain a workplace free of severe and pervasive sexual harassment.  Second, the court's opinion places an undue burden on employees who wish to complain of harassment in the workplace.  Third, the court's opinion has the potential to breed disrespect for the law.

---

[21]  The court implies that someone in the Parks and Recreation Department management was responsible for implementing the City's policy against sexual harassment by observing that "neither Faragher nor [fellow lifeguard Nancy] Ewanchew complained to Parks and Recreation Department management about" the harassing conduct in question.  Ante at 3.  By suggesting that Faragher had to find someone in the management of that department with whom to lodge her complaint, the court ignores the reality of Faragher's workplace.  The Parks and Recreation Department management was located elsewhere and had little, if any, contact with the Marine Safety Section's employees, while Terry was close at hand and was "in charge" of virtually every aspect of Faragher's work environment.

A.

The court exonerates the City from liability because Faragher did not complain to someone in the Parks and Recreation Department management. The court does so even though Faragher had not been told to whom she should complain. An employer reading the court's opinion may conclude that it, like the City of Boca Raton, can escape Title VII liability by having a policy against sexual harassment but concealing from its employees the identity of the person to whom claims are to be made. Because such concealment would have the potential for reducing claims of sexual harassment, and thus the cost of doing business, an employer might choose to follow the City's footsteps. The employer's other alternative, of course, would be to identify the person to whom complaints are to be made and to have an efficient mechanism for investigating them and taking curative measures when necessary. No system is perfect, however. Thus, an employer with a model system in place cannot render itself immune from claims. In weighing the costs of the two alternatives, an employer may opt for the course the City took in this case. That course may yield more sexual harassment but less liability, and thereby dilute the employer's Title VII duty.

B.

To the extent that the court's opinion induces employers to conceal the identity of the person to whom complaints of sexual

harassment are made, the opinion places an undue burden on employees who suffer such harassment.  Under my approach, if the employee is not informed of the identity of the person to whom complaints are to be made, the employee would simply turn to the person in charge of the workplace.  Under the court's approach, the employee must guess to which of the employer's agents or employees a complaint should be lodged.  Depending on the circumstances, this could be risky business.  Among other things, the employee might err in selecting the person to whom to complain, in which case her complaint could go for naught. [22]  Faced with this uncertainty of outcome, the employee might forego complaining and either suffer the harassment or terminate her employment.

C.

The scenarios depicted in subparts A and B above, which I submit are entirely plausible, will in time breed disrespect for the law.  Although I am sure that the court does not intend such a result, I contend that the result is likely.  For employers, escaping Title VII liability for sexual harassment in the workplace will be seen as a game --  a game to be played with cards dealt from a deck composed of law of agency principles.  The object of

[22]  Lodging a complaint imposes on the employee certain costs, including embarrassment and disruption of working relationships.  Where the employee does not know to whom to complain, it may be that she will complain to the wrong person and that her complaint will not be addressed properly.  Where the employee faces the costs associated with lodging a complaint and sees little likelihood that her complaint will yield any benefit, the employee would probably not complain.

the game is to escape Title VII liability without affording employees the protection that Title VII purports to provide. For employees, Title VII will be seen as an empty promise -- a mere sop, if you will -- enacted by Congress to placate a constituency

ANDERSON, Circuit Judge, concurring in part and dissenting in part:

With respect to Faragher's Title VII sexual harassment claim against the City, I agree with Judge Barkett that the district court should be affirmed. I agree with much of what is said in Judge Barkett's opinion. I agree with Judge Barkett that the City was appropriately found liable pursuant to the theory of "direct liability." In addition to the facts pointed out by Judge Barkett relating to the severity and pervasiveness of the conduct constituting a hostile environment, I would rely upon the testimony regarding the intermediate supervisor, Gordon. When plaintiffs complained to him, he indicated that the City did not care. I think this evidence of the City's lack of concern also supports the district court's finding of constructive notice.

I also agree with Judge Barkett that the City could be liable under a theory of "indirect liability," i.e., pursuant to the agency principles upon which our previous hostile environment cases have relied. I need not decide the threshold level of authority which a supervisor must possess in order to impose liability on the employer under these principles. For example, I need not decide that every supervisor with some authority relating to personnel can impose liability on the employer. It is sufficient for the disposition of this case, in my judgment, that Terry was endowed by

40

the City with sufficient authority to impose liability on the City. The City placed Terry in charge of this particular workplace and in charge of the plaintiffs and similarly situated employees. The following facts support the conclusion that Terry was endowed with "virtually unchecked authority over the work environment."[23] The City left Terry wholly unsupervised with respect to Terry's management of the workplace including the setting of its environment; the City gave Terry no effective instructions with respect to its sexual harassment policy or any other policy related to the work environment; and the City did not disseminate its policy against sexual harassment to plaintiffs or similarly situated employees. Having thus endowed Terry with complete authority to set the workplace environment, I have no difficulty concluding that Terry's conduct in determining the nature of the work environment was within the scope of his authority, or at least that he was aided in the actions he took by the agency relationship.[24]

---

23   Judge Barkett at _____ (M/S at 10).

24   I need not decide whether the foregoing facts support agency liability under the scope-of-employment prong or under the aided-in-accomplishing-the-tort-by-the-agency-relationship prong or both. As suggested by Judge Barkett's analysis, I suspect the analysis is similar under either prong.