**Roberta C. ABRAMS, Plaintiff,**

**v.**

**PIEDMONT HOSPITAL, INC., John Williams, Barbara Anderson, and Joanne Clendenin, Defendants.**

**No. 1:96–CV–182 JEC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1997.

Michael Weinstock, Louis R. Cohan, Weinstock & Scavo, Atlanta, GA, for Plaintiff.

Daniel M. Shea, Catherine M. Hobart, Smith Currie & Hancock, Atlanta, GA, for Defendants.

## *ORDER*

CARNES, District Judge.

The above entitled action is presently before the Court on plaintiff's Objections [50] and defendants' objections [52] to the Magistrate's Report and Recommendation [49] concerning defendants' Motion For Summary Judgment [32–1]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that, as to the federal claims, plaintiff's objections should be **DENIED** and defendants' objections should be **SUSTAINED.** Specifically, the magistrate judge recommended the granting of summary judgment as to all federal claims, except retaliation claims relating to three incidents. The Court adopts the magistrate judge's recommendation as to all federal claims except these retaliation claims. Upon review of the record and pleadings, the Court concludes that defendant should be granted a summary judgment as to that and all federal claims. Further, as to state

claims, the Court declines to exercise its supplemental jurisdiction over those claims and they are dismissed without prejudice to the right to refile in state court. Thus, The Magistrate's Report and Recommendation [49] should be **AFFIRMED IN PART** and **REVERSED IN PART** and defendants' Motion For Summary Judgment [32–1] should be **GRANTED** as to all federal claims and **DENIED** as to all state claims, which are hereby **DISMISSED.**

The case is also before the Court on defendants' Motion For Sanctions [32–2]. The Court concurs with the magistrate judge's recommendation [56] to deny this Motion and, accordingly, defendants' Motion For Sanctions is **DENIED.**

## I. Factual Background

Plaintiff filed the present suit alleging that her employer imposed disciplinary action upon her and, ultimately, fired her in retaliation for her complaints about violations of Title VII. The Court adopts the magistrate judge's findings of fact and restates some of those facts for purposes of understanding the Court's reasoning.

Plaintiff was employed in the registrar's office at Piedmont Hospital. Her duties included obtaining pertinent information and registering new patients. Obviously, courteous and professional conduct toward patients was an essential part of plaintiff's duties. In 1994, defendant ["the hospital" or "Piedmont Hospital"] received oral and written complaints about plaintiff's poor interpersonal skills and rude behavior. Specifically, in February, 1994, a patient, Laura White, completed a written survey in which she complained about plaintiff's unpleasantness.[1] Two months later, on April 1, 1994, patient Rosanne Kohanim orally complained to plaintiff's supervisor about plaintiff's rude behavior during the registration process, stating that plaintiff had "made her feel like crying." (Mag. Rep. & Rec. [49] at 6). A few weeks

later, on April 28, 1994, a friend of Ms. Kohanim's sent a letter to the hospital complaining about plaintiff's behavior during the registration process, in which this friend alleged that plaintiff had become "borderline abusive."[2] *Id.*

Consequently, on two occasions in April—April 8, 1994 and April 25, 1994—plaintiff's supervisor, Barbara Anderson, counseled plaintiff about patient complaints. On August 17, 1994, plaintiff received a performance appraisal that fell below acceptable standards and was denied a merit bonus check.

Approximately seven months after her initial complaint about plaintiff, on October 31, 1994, patient Kohanim sent a written complaint to Piedmont Hospital developing in greater detail plaintiff's poor attitude, including the fact that plaintiff had denied a wheelchair to Kohanim on April 1, even though Kohanim's leg was in pain. Kohanim also complained that plaintiff had completed her insurance form in a way that had caused her problems in having the form processed, which event was presumably another reason for the additional complaint.

On November 15, 1994, the hospital give plaintiff a final warning, indicating that should they receive any further complaints about "rudeness, coldness or failure to complete your tasks, you will be terminated." Two weeks later, plaintiff's attorney sent a letter to the hospital alleging that this warning was a act of race and age discrimination. (Interestingly, although an allegation of sexual harassment is the centerpiece of this law suit, plaintiff's counsel made no mention of any sexual harassment in this letter. Moreover, the initial allegation of racial discrimination has fallen out of the suit).

Thereafter, on December 14, 1994, plaintiff filed a complaint with the EEOC alleging sexual harassment, age discrimination, sex discrimination, and retaliation; this com-

---

1. "The woman who registered me was not very pleasant—she complained a great deal about how busy she was." (Mag. Rep. & Rec. [49] at 6.)

2. According to the letter, plaintiff "seemed to become frustrated as her tone of voice rose and her attitude became borderline abusive. My friend became obviously upset, due in part to her circumstances and in part to the manner in which she was being dealt with." (Mag. Rep. & Rec. [49] at 6.)

plaint contained no details about the alleged harassment or the identity of the harasser. Hospital officials repeatedly requested that plaintiff offer some explanation of her allegation of sexual harassment. Despite these repeated entreaties, neither plaintiff nor her counsel would identify the alleged harasser or describe any of this anonymous person's purported harassment to the hospital.

Finally, in May, 1995, the EEOC told the hospital that plaintiff had indicated to them that the "harasser" was John Williams, a co-worker of plaintiff's. Immediately thereafter, hospital officials met with plaintiff's four co-workers. All of these co-workers, except for Williams, were female.[3] These co-workers denied engaging in or witnessing any verbal or physical behavior that they considered to be sexual harassment. One co-worker, Annette Teague, did indicate, however, that John Williams, a gay co-worker, had playfully touched her on the buttocks and, while she was not offended, she did tell him not to do that again.

Upon completion of this investigation in May, 1995, hospital officials redistributed a copy of the hospital's sexual harassment policy to each employee in that division and warned them to refrain from any conduct that might be considered sexual harassment. Because plaintiff would not provide them with any details concerning her particular allegations, it was impossible for the hospital to do anything more.

Three months later, in August, 1995, the hospital received another patient complaint about plaintiff from patient Martha Faulkner, who complained about plaintiff's "offensive" and "abrupt" attitude. Plaintiff's supervisor, Barbara Anderson, telephoned Faulkner to discuss the complaint and, in that conversation, requested that Ms. Faulkner put her complaint in writing.[4]

A month later, in September, 1995, supervisors Joanne Clendenin and Barbara Anderson met with plaintiff to discuss this latest complaint. Although the terms of the final warning issued in November, 1994 provided that plaintiff was subject to immediate termination if she were the subject of another patient complaint, Ms. Clendenin and Anderson merely suspended plaintiff for 2½ days without pay, instead of terminating her. Not grateful at this apparent leniency, however, plaintiff filed a second charge of discrimination with the EEOC, alleging that she was suspended in retaliation for filing her first charge of discrimination ten months earlier. Plaintiff's December, 1995 review, issued a couple of months later, again graded her as below acceptable standards and she did not receive a merit bonus check. In January, 1996, she filed the present law suit.

A few months later, in April 1996, Avis Weaver, a black female patient, complained at the hospital to Barbara Anderson that plaintiff had not treated her in a professional manner during her registration process. In particular, Ms. Weaver heard plaintiff, speaking in a voice loud enough to be heard by Ms. Weaver, make racially disparaging remarks in a conversation with a co-worker. More significantly for Ms. Weaver, who is a well-educated, black woman, was the fact that she believed plaintiff to have spoken to her directly in a condescending manner. Specifically, plaintiff asked whether she was on welfare and referred to plaintiff's parents as her "mama and papa." According to Ms. Weaver's deposition, plaintiff's entire tone was rude, punctuated with sighs and huffing and puffing. Moreover, plaintiff entered the wrong social security number for Ms. Weaver on some of her paper work.

Ms. Weaver further indicated that she did not return to Piedmont Hospital, both because of its distance from her home and because of plaintiff's rude treatment of her. See generally Deposition of Avis Weaver. After receiving this oral complaint, supervisors attempted several times to reach Ms. Weaver by telephone, before finally speaking to her and confirming this complaint.

---

3. Indeed, all of plaintiff's supervisors—Barbara Anderson, Joanne Clendenin, and Ann Renner— were, likewise, women. It is these female supervisors whom plaintiff alleges to have engaged in sex discrimination, condonation of sexual harass-

ment, and retaliation because of a "complaint" by plaintiff regarding sexual harassment.

4. Apparently, Ms. Faulkner never put anything in writing.

Less than a month after Ms. Weaver's complaint, in May, 1996, Tanya Erwin, one of plaintiff's co-workers reported to Ann Renner, who by this time had taken Joanne Clendenin' s place as Director of Admissions, that plaintiff demonstrated a poor attitude with patients, including an incident in which plaintiff shouted at a deaf patient.

A month after this report, in June, 1996, Talmadge Chandler, the husband of a patient, verbally complained to Barbara Anderson that his experience with plaintiff was the only negative thing about his wife's visit to the hospital.[5] Ms. Renner investigated these complaints, met with plaintiff to discuss the continued complaints, and terminated plaintiff for rude and discourteous behavior toward patients.

## II. Sexual Harassment Claim[6]

The magistrate judge granted summary judgment to defendant on plaintiff's claim of sexual harassment. The Court concurs and, in addition, notes the following.

■ First, not mentioned by the magistrate because it was not yet published, is the recent Eleventh Circuit *en banc* decision in *Faragher v. City of Boca Raton*, 111 F.3d 1530 (11th cir.1997) (en banc). In that expansive opinion, the Eleventh Circuit set out the parameters for determining when an employer would be held responsible for the existence of a hostile work environment, in terms of sexually harassing conduct. According to *Faragher*, an employer is liable for such conduct only when the harasser is acting within the scope of his employment in perpetrating the harassment or when the harasser is aided in accomplishing his harassment by the existence of the employment relationship. *Id.* At 1535. Here, assuming that Williams' conduct even constituted sexual harassment, it is clear that it was not the policy of Piedmont Hospital nor within the scope of John Williams' duties to harass another employee. As to the second requirement, which largely requires *quid pro quo* harassment, Williams did not indicate that plaintiff would be fired or sanctioned if she did not allow him to joke with her in a sexually explicit manner. Indeed, as a fellow employee with less seniority than plaintiff, Williams was in no position to make that kind of threat against plaintiff.

■ Second, the Court, like the magistrate judge, concludes that plaintiff has failed to show that she was the victim of a sexually hostile workplace.[7] As the magistrate judge noted, a plaintiff must show that she was subjected to unwelcome sexual harassment, that the harassment was based upon her sex, and that the harassment affected a term or condition of her employment. What has been lost in plaintiff's allegations is the recognition that offensive conduct in the workplace—even when that conduct includes some explicit sexual comments—is actionable as sexual harassment only when it constitutes discrimination based on the sex of the recipient of the harassment. Some memory of the evolution of these kinds of claims is helpful. Harassment claims originated in a racial context when, with the apparent knowledge of the employer, white employees, unhappy at having a black in the workplace, would taunt a black employee to such an extent that this harassing conduct either caused the black employee to quit or rendered his working conditions substantially different, and worse, than those of a white employee.[8] Similarly, in early sexual harassment cases based on a hostile work environment, a female plaintiff would have been beset with demeaning comments and conduct, all designed to humiliate her to an extent that she would either leave or her daily life would be miserable, again for

---

**5.** According to Mr. Chandler, plaintiff failed to copy information from an insurance card and, although he and his wife were anxious, plaintiff did not seem concerned about them.

**6.** The Court adopts the magistrate judge's Report and Recommendation on plaintiff's claims of age discrimination and sex discrimination (disparate treatment based on sex).

**7.** The Court discusses this issue because the *de minimis* nature of the alleged harassment ties into the subsequent discussion of retaliation.

**8.** *See, e.g.,* cases cited in *Henson v. City of Dundee*, 682 F.2d 897, 901 n. 4 (11th Cir.1982).

no other reason than that she was a woman.[9]

Here, plaintiff has alleged little more than the annoying conduct of a co-worker. Because the co-worker was a male and because some of the conduct had a sexual content, plaintiff would transform this immature conduct into a sexual harassment claim. Specifically, plaintiff complains that John Williams once informed her that he had just had oral sex with a male UPS driver in the parking lot, that he once brought pornography into the workplace, that he once altered a Christmas invitation to plaintiff by adding the word "busted" before plaintiff's middle name, "Cherry", and that, on occasion, he would brush up against her, on purpose, to annoy her.[10] Plaintiff considered physical contact to be more than a brush, but less than a grope or a grab.

Plaintiff has admitted that Williams never propositioned her for sex, that he never showed any kind of romantic interest in her, and that she never felt threatened by him. Plaintiff has made clear in this law suit, however, that she did not find Williams' banter to be amusing or his discussion of his gay sex life to be something she wanted to hear. Indeed, Williams purposefully brushing up against plaintiff for the purpose of vexing her does sound like the conduct of a second grader trying to antagonize a class mate. Clearly, such conduct was neither mature nor professional. Neither, however, was it sexual discrimination. Indeed, for the most part, the only person demeaned by Williams' conduct or comments was Williams. As a junior co-worker, he hardly had any leverage over any aspect of plaintiff's employment. As the only male employee in a unit that was also totally supervised by women, one cannot reasonably infer that Williams' sophomoric conduct constituted sex discrimination.

Title VII prohibits discrimination on the basis of sex; harassment claims are actionable only to the extent that they make out a case of sexual discrimination. The law prohibiting sexual harassment does not, however, create a federal civility patrol, empowered to weed out any obnoxious or crude behavior, even when sexually explicit, by co-workers. For the above reasons, as well as those set out by the magistrate, the Court concurs in the magistrate judge's recommendation that summary judgment be granted to the defendant on this claim.

### III. Retaliation Claims

In his report and recommendation, the magistrate judge identified four instances of potential retaliation: (1) the evaluation in August, 1994, in which plaintiff received a less than satisfactory rating; (2) the final warning in November, 1994, in which plaintiff was warned that if there were any more complaints about her rudeness by patients, plaintiff would be fired; (3) the 2½ day suspension in September, 1995, after the hospital had received another complaint about plaintiff from a patient;[11] and (4) the hospital's termination of plaintiff in June, 1996, after receiving three more complaints about her conduct toward patients.

■ As to the first event of alleged retaliation—plaintiff's evaluation in August, 1994—the magistrate judge concluded that plaintiff had failed to make out a *prima facie* case and granted defendant summary judgment. This Court agrees. In order to make out a *prima facie* case of retaliation under Title VII, a plaintiff must show first, that the plaintiff engaged in protected opposition to Title VII discrimination; second, that plaintiff was subject to adverse action by her employer; and third, that there was a causal connection between the protected opposition and the adverse employment action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993).

■ The Court concurs with the magistrate judge in his conclusion that plaintiff did not engage in protected opposition to Title

---

9. *See, e.g.,* cases cited in *Henson v. City of Dundee,* 682 F.2d 897, 902 n. 6 (11th Cir.1982).

10. Plaintiff also complains about non-workplace conduct by Williams. Specifically, Williams allegedly would call her at home sometimes and say, "Hey, bitch, what's going on," at which time plaintiff would typically tell him that she was tired and was going to bed.

11. Around this same time, there was also a negative performance evaluation of plaintiff that is also alleged to have been retaliatory.

VII discrimination, prior to the issuance of the August, 1994 evaluation. Plaintiff argues that her "protected opposition" was her opposition to the sexual harassment visited upon her by Williams and that she manifested this opposition by, on occasion, telling Williams to "stop" when supervisor Barbara Anderson was within earshot and, on occasion, telling Anderson that she had had enough, in relation to Williams' annoying conduct.

The Court agrees with the magistrate that such utterances by plaintiff were clearly insufficient to put Anderson on notice that plaintiff was complaining of sexual harassment. Assuming that plaintiff once told Anderson that "she had had enough," such a statement could have referred to any number of workplace annoyances. A supervisor hearing such a complaint, by itself, cannot be imputed with knowledge that the speaker is complaining about sexual harassment. Indeed, even had plaintiff elaborated to her supervisor the incidents that she found annoying, it is unclear that the supervisor, who is not a lawyer, would have been put on notice that plaintiff was complaining about sexual harassment. As noted in the earlier discussion, it is the subject of great dispute now between the attorneys as to whether Williams' conduct constituted sexual harassment and, in fact, this Court has concluded that it did not meet the criteria. While a plaintiff claiming retaliation for her opposition to discriminatory conduct need not prove that the underlying conduct was, in fact, unlawful,[12] the fact that plaintiff's characterization of the conduct is lacking under a legal analysis of the evidence means that one cannot expect a layman supervisor to leap to the conclusion that plaintiff's remarks constituted an allegation of sexual harassment.

▆ Moreover, plaintiff cannot successfully argue that the "sexual harassment" by Williams was so pervasive that knowledge should be imputed to Ms. Anderson. *See,*

*Henson v. City of Dundee,* 682 F.2d 897, 905 (11th Cir.1982). Upon inquiry, plaintiff's three female co-workers denied engaging in or witnessing any verbal or physical behavior that they considered to be sexual harassment. (Mag. Rep. & Rec. [49] at 10.)

▆ Similarly, the Court agrees with the magistrate that plaintiff has also not established the third prong: the causal connection between the protected conduct and the adverse action. While the standard for demonstrating a causal connection is not stringent,[13] it requires some showing of a causal nexus. Here, as the magistrate judge noted, plaintiff has not been able to show with any precision when these comments by her were made and that it is possible that they were made so long before the evaluation that no reasonable finder could conclude that there was any relation between the two events.

Finally, even if plaintiff were deemed to have made a *prima facie* case, defendant has offered a neutral, nondiscriminatory reason for the negative evaluation: specifically, the complaints by patients against plaintiff. See generally discussion *infra* at 20.

### B. *Final Warning*

The magistrate judge declined to grant summary judgment to defendant as to any retaliation claim by plaintiff concerning the final warning issued by defendant in November, 1994, because the magistrate concluded that defendant had never moved for summary judgment on that issue.[14] Defendant has objected to the magistrate's refusal to grant summary judgment on this ground and the Court concurs with defendant's reasoning. In its motion for summary judgment, defendant Piedmont Hospital asked the Court "to enter summary judgment in [defendants'] favor on all of Plaintiff's claims." (Defs.' Mot. For Summ.J. [32–1] at 1.) Defendant did not, however, address the issue of the "final warning" because, as they have

---

**12.** *Little v. United Technologies,* 103 F.3d 956, 960 (11th Cir.1997).

**13.** The plaintiff must establish that the protected activity and the adverse action were not wholly unrelated. *Simmons v. Camden County Bd. Of Educ.,* 757 F.2d 1187, 1189 (11th Cir.), cert.

denied, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985).

**14.** The magistrate judge did express doubt that a "final warning" would constitute an adverse action for purposes of a retaliation claim. (Mag. Rep. & Rec. [49] at 35 n. 8.)

explained in its pending objections, it was unaware that plaintiff was claiming retaliation in connection with this warning until plaintiff responded to the motion. Specifically, defendant notes that plaintiff did not identify the final warning as an act of retaliation in either her complaint or amended complaint. Moreover, defendants did respond to plaintiff's introduction of the issue of the final warning in its reply brief, so defendant's argument was before the magistrate judge prior to the issuance of the report and recommendation.

Defendants have been thorough in their pleadings concerning summary judgment and it would have made no sense for them not to move for summary judgment on the warning matter, had they known that plaintiff was contending this to be an act of retaliation. In fact, plaintiff did not allege this theory in her complaint. Moreover, the issue has been briefed by the parties. Inasmuch as this Court is granting summary judgment as to retaliation claims that involve much more serious sanctions, such as the ultimate termination of plaintiff, it makes little sense to allow this one claim to get to a jury, on such a technical ground, particularly inasmuch as the Court concludes that the claim is without merit.

■ As to the merits, the Court tends to agree with both the magistrate judge's and defendant's observations that the issuance of a final warning,[15] by itself, does not constitute an adverse action. *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (Title VII was designed to address ultimate employment decisions and not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions). There were no consequences to the warning other than to provide plaintiff with notice that should she be·the subject of any other patient's complaints, she would be terminated. Indeed, had defendant attempted to fire plaintiff without first giving her a warning and a second chance, plaintiff would understandably have complained. It ill serves em-

ployees' interests to require a employer to fire an employee outright rather than to first give a warning. Accordingly, the Court concludes that the final warning did not constitute an adverse action.

In addition, as with the previous analysis concerning the 1994 performance evaluation, plaintiff has not made out a *prima facie* case, for the reasons stated in that analysis. In particular, she has not shown that she engaged in any protected conduct prior to issuance of the warning. Moreover, defendant had a legitimate, non-discriminatory reason for the warning: the receipt of patient complaints concerning plaintiff.

### C. *Suspension, 1995 Evaluation and Termination*

After the issuance of the final warning in November, 1994, plaintiff filed an EEOC complaint, in December, 1994, alleging retaliation, sexual harassment, age discrimination, and sex discrimination. Thereafter, in August, 1995, the hospital received another complaint concerning plaintiff from a patient and plaintiff was suspended for 2½ days in September, 1995. Plaintiff received an unsatisfactory evaluation in December, 1995. In January, 1996, plaintiff filed the present complaint. In April–June, 1996, the hospital received three more complaints concerning plaintiff's rudeness toward patients. Thereafter, the hospital terminated plaintiff.

Given plaintiff's filing of an EEOC complaint that predated the suspension and the 1995 evaluation and given the filing of a law suit by plaintiff that preceded her termination, plaintiff has clearly established one prong of her prima facie case for retaliation: that she engaged in protected conduct. Likewise, plaintiff has established the second prong: that she was subjected to adverse action by her employer. The Court will also assume that, for purposes of showing a *prima facie* case, she has met the third prong; i.e., she has demonstrated a causal connec-

---

**15.** The notice stated, "This is a final warning. Should we receive any further complaints about rudeness, coldness or failure to complete your tasks, you will be terminated." (Mag. Rep. & Rec. [49] at 8.)

tion between the protected opposition and the adverse action.[16]

Even after a plaintiff has made a prima facie case, however, the defendant has an opportunity, under the *McDonnell Douglas* analysis [17] to demonstrate a legitimate, non-discriminatory reason for the adverse action, after which the plaintiff must adduce evidence suggesting that these reasons are pretextual in order to avoid summary judgment. Here, the defendant has produced substantial reasons, independent of retaliatory motive, for the adverse actions. Specifically, in November 15, 1994, the hospital gave plaintiff a final warning indicating that she would be fired if the hospital received any more complaints concerning plaintiff's rudeness to patients. In August, 1995, the hospital received another complaint from a patient in which the latter complained about plaintiff's "offensive" and "abrupt" attitude. Although the hospital had indicated that plaintiff would be fired if she received another complaint, they treated her leniently and only suspended her for 2 ½ days. In the time period between issuance of the final warning and the suspension, plaintiff had filed a complaint with the EEOC in December, 1994, which was one month after the final warning and eight months prior to the suspension.

■ The Court concludes that the receipt by the hospital of another complaint constituted a legitimate, non-discriminatory reason for its decision to suspend plaintiff. Indeed, the hospital had told plaintiff that she would face even more serious consequences if she received another complaint. Moreover, the event that triggered the sanction—a patient complaint—was one over which the hospital had no control.

Likewise, the hospital's decision to terminate plaintiff in June, 1996 was also triggered by three additional complaints, since the sus-

pension, concerning plaintiff's rudeness to patients; again, the hospital did not solicit these complaints. The Court concludes that the receipt of three additional complaints after plaintiff had been warned about the consequences of continued rudeness to patients and had even been suspended for her conduct constitutes a legitimate, nondiscriminatory reason for defendant's decision to terminate plaintiff.

As to these latter two sanctions, however, the magistrate judge declined to grant summary judgment. As to the complaint by patient Martha Faulkner, which led to plaintiff's suspension, the magistrate agreed that defendant had not solicited the complaint. Because, however, the Director of Admissions, Joanne Clendenin, telephoned Faulkner and requested that she send in a written confirmation of her earlier, oral complaint,[18] the magistrate concluded that this fact created a material issue of disputed fact as to whether defendant sanctioned plaintiff in retaliation for her protected activity.

As to the three subsequent verbal complaints that led to plaintiff's termination, the magistrate likewise found a disputed issue of fact concerning the retaliatory motivation of defendant as a result of the latter. In support of that conclusion, the magistrate noted that Ms. Renner, the new Director Of Admissions, tried repeatedly to reach one of the complainants, patient Avis Weaver, to confirm her complaint and to request that she put it in writing. The magistrate judge notes: "It appears that a lot of hostility between these individuals arose during the last part of plaintiff's employment and a jury could reasonably conclude that Piedmont's actions in telephoning patients who did not file written complaints was done in retaliation for plaintiff's complaints of discrimination." (Mag. Rep. & Rec. [49] at 41.)

**16.** As noted, to establish this connection, a plaintiff need show only that the protected activity and adverse action were not wholly unrelated. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993).

**17.** While the facts in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) involved discrimination in the workplace, the Eleventh Circuit has recognized that

the same framework should apply to retaliation cases. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir.1993).

**18.** Ms. Clendenin testified that she perhaps had chased down a patient complaint on only two other occasions, but could not recall the names of the employees who were the subject of the complaints.

At the outset, the Court notes that plaintiff has not demonstrated pretext as to either of these sanctions. She has not shown that there were other employees who had been the subject of several complaints for rude conduct, who had been warned that they would be fired if the conduct persisted, and who upon receiving further complaints by patients were thereafter treated more leniently than plaintiff.[19]

Second, denial of summary judgment when there are legitimate reasons for the employer's sanction, simply because there have been bad feelings between an employer and an employee, means that an employer will rarely be able to discipline an employee who has filed a grievance, even when there are objectively reasonable, and even compelling, reasons to do so. In the present situation, plaintiff had been the subject of repeated complaints by patients concerning the former's rudeness. When confronted with these complaints, plaintiff never showed any concern that she had upset vulnerable, sick people who were looking for support, not antagonism, from hospital personnel. Likewise, plaintiff never indicated that she would try to improve nor did she accept any responsibility for her conduct. Instead her reaction on learning of each complaint was to file a grievance because the hospital had shown the temerity to counsel her about these matters. These grievances escalated from a letter from her attorney, after the warning letter from the hospital, to the filing of two EEOC complaints and the present law suit. Moreover, after alleging sexual harassment, plaintiff refused to provide the hospital with any details of her allegation so that it could investigate.

The Court states all of the above not to criticize plaintiff for filing these grievances;

she clearly has a constitutional right to do so. Rather, the Court describes these events to echo the magistrate's observation that there were probably less than warm feelings between plaintiff and hospital supervisors. In a case involving such employment disputes, one would assume that bad feelings are the norm. Yet, it is not a prerequisite to an employer's defense of a retaliation claim that the employer like the disciplined employee. Presumably, employers will typically have less regard for employees whose performance triggers the need for disciplinary action.

Moreover, the law governing retaliation does not impose a blanket prohibition against the imposition of sanctions against an employee who has earned such sanctions, merely because the employee has filed a grievance. If that were the case, an unsatisfactory employee would be able to file a grievance upon the first revelation of her misdeeds and receive forever immunity against discipline by the employer for her clearly inadequate work. Indeed, were that the law, only a very careless employee would fail to file a grievance whenever he felt that his employer were displeased with his work performance.

In finding a disputed issue of fact concerning the retaliatory motive of defendant, the magistrate judge also noted the efforts by hospital supervisors to confirm patients' verbal complaints and to seek written confirmation of those complaints. While it appears undisputed that hospital personnel had rarely, if ever, gone to such *efforts* to confirm complaints, there is no evidence that the hospital had ever been involved in a situation like the one here, in which an employee was repeatedly rude to patients, had shown no contrition, had been warned and sanctioned,

19. The Rule 30(b)(6) deposition of hospital representative, Joan Kraft, did indicate that upon review of the hospital's entire collection of patient surveys, she had found complaints against two other employees in the registrar's office: Barbara Anderson was the subject of one complaint and John Williams was the subject of a second complaint. Anderson was described as looking "sad" in a third complaint that focused largely on perceived inadequacies in hospital procedures and services that did not pertain to her. *See* Dep. Of Joan Kraft, at 21, 84–85.

The evidence does not indicate that there were any employees in the registrar's office, however, who received persistent complaints over a short period of time, as did plaintiff. In particular, plaintiff received eight complaints concerning six incidents, over a two year period, with one incident so upsetting that the patient continued to pursue the complaint seven months after the offending incident. Moreover, the evidence does not indicate that any employee, after being warned about further rudeness toward patients, continued to receive complaints.

and had responded with EEOC complaints and a law suit. Arguably, the hospital was not required to confirm these oral complaints before firing plaintiff. Based on its warning, it could have fired her simply upon the receipt of the complaint. Yet, the Court agrees with defendant that, given the filing of the law suit and EEOC complaints, it would have been highly imprudent for the hospital to sanction plaintiff without making any effort to corroborate the complaints. Indeed, plaintiff would have likely complained loudly had defendant sanctioned her without trying to confirm these complaints. Beyond prudence, the hospital's actions also insured the fairest outcome for the employee, in that investigation of the complaint might have revealed information that could mitigate the plaintiff's conduct. Plaintiff's argument would mean that an employer could never investigate the alleged misconduct of an employee who has filed a grievance, with the result that either the employee would have to be summarily dismissed upon a new complaint—which is obviously not beneficial to the employee—or the employer would be constrained from taking any disciplinary action against an employee who might deserve such action. Neither result is desirable or required by the law.

In summary, the Court concludes that summary judgment is appropriate on the retaliation claim, as well as all other federal claims and **GRANTS** defendants' Motion For Summary Judgment [32–1]. The Court declines to exercise its supplemental jurisdiction over state law claims and these are dismissed without prejudice. In accordance with this order, the Court **ADOPTS** the magistrate judge's report and recommendation [49] as to all federal claims, except the retaliation claim. Further, the Court **DENIES** defendants' Motion For Sanctions [32–2]. The Clerk is **DIRECTED** to close this case.

SO ORDERED.