Sharon HUSKEY, Plaintiff,

v.

JEFFERSON SMURFIT CORPORATION/CONTAINER CORPORATION OF AMERICA, Defendant.

No. Civ.A. 1:96–CV–2517–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 27, 1998.

Charlotte York Kelly, Atlanta, GA, for plaintiff.

Donald B. Harden, Fisher & Phillips, Atlanta, GA, Eric K. Smith, Littler Mendelson, Atlanta, GA, for defendants.

## ORDER

FORRESTER, District Judge.

This case is before the court on the Report and Recommendation of Magistrate Judge Gerrilynn G. Brill and the parties' objections thereto.

## I. STATEMENT OF THE CASE

### A. *Undisputed Facts*

Defendant, Jefferson Smurfit Corporation, is engaged in the business of manufacturing containers. Plaintiff was hired by Defendant on November 4, 1994 as a probationary employee at its Stone Mountain facility. Plaintiff was hired to perform the feeder/takeoff function in the manufacturing process. This position is part of a crew of three or four persons working on a gluer/folding machine. The feeder places the unprinted, unglued and unformed carton flats into an automatic feeding hopper and a folding/gluer machine. The takeoff position then requires one or two individuals to inspect visually and then to pack the completed carton or box into a

corrugated shipping box. The gluer operator is the third person on the crew. This operator is responsible for the running, adjustment and speed of the equipment and, in some cases, helping with the training of members of different crews. Several of the Defendant's feeder/takeoff employees have stated that if one person on the feeder/takeoff crew is operating at a slow pace, then the entire crew's performance is slowed.

### 1. The Alleged Harassment

The training for probationary feeder/takeoff such as Plaintiff consists entirely of on-the-job training. Finishing Department Manager, Steve Christian, and Shift Supervisor, David Camp, directly supervised Plaintiff's performance. Each had the authority to terminate Plaintiff's employment.

On January 10, 1995, Plaintiff was "taking off" legal file folders on machine number 27, which was operated by Thomas Wolfe. At the beginning of the shift, Rosemary Ellis was working as a second takeoff on machine number 27 and was training Plaintiff. Mr. Wolfe also attempted to train Plaintiff that night. Mr. Wolfe and Ms. Ellis each indicated that, despite their efforts, Plaintiff was not catching on.

Lead person Charles Lawrence observed Plaintiff's difficulties on machine number 27. He asked the machine operator, Cullen Kern, to attempt to train Plaintiff. In attempting to train Plaintiff, Mr. Kern first explained and then demonstrated how properly to take the boxes off the belt and pack them in shipping boxes. Plaintiff states that after that explanation, Mr. Kern indicated that it looked like she had the hang of it. Nonetheless, Plaintiff admits that after Mr. Kern explained that the takeoff has to remove the folders from the conveyor belt and rotate them by moving the right arm over the left, she said that she understood the instructions, then proceeded to pack the folders by rotating her left arm over her right arm.

After Plaintiff failed to understand Mr. Kern's verbal instructions, he approached her from behind and reached around her, placing his hands on her arms, and moved her arms through the proper motions for taking off on machine number 27. Plaintiff states,

> [Mr. Kern] clinged up against my butt so tight I could hardly stand up. I could have flipped over that belt. And every time I reached to get the carts he's all over my behind. When I take to put the carts in the box, he all on my behind.

(Huskey Depo. at 85, 93). Plaintiff appears to claim that Mr. Kern trained her in the same physical manner two times that night. Plaintiff also alleges that during the second incident, Mr. Kern whispered in her ear, "[I] need to handle them carts like they are ten-dollar bill. Ninety pound women come in here and outwork us men. You do want to pass your probation, don't you, don't you?" (Huskey Depo. at 93, 114). Plaintiff further asserts that she could feel Mr. Kern's "private area against her butt." (Huskey Depo. At 94, 153–54). These two incidents form the basis of Plaintiff's sexual harassment complaint.

A female co-worker standing only a few feet away did not observe anything sexual or vulgar in Mr. Kern's actions. (Brandenburg Aff., ¶¶ 4, 5). Plaintiff and Mr. Kern had never worked together prior to the January 10, 1995 incident. Plaintiff admits that Mr. Kern never harassed or touched Plaintiff at any time either prior to or after the training incident. She further admits that after the training incident, she was never harassed by any other employee of Defendant.

### 2. The Employer's Policy and Response

Plaintiff voiced no objection to Mr. Kern's training method and showed no signs of protest during the January 10, 1995 incident. She did not complain that night to anyone about Mr. Kern's training methods. On January 13, 1995, however, Plaintiff called Jim Logan, Defendant's Human Resources Manager, to complain about the training incident. Plaintiff told Mr. Logan that while Mr. Kern was training her, he stood closely behind her, reached around her, took her hands and moved them through the motions required to pack the cartons properly. Plaintiff did not tell Mr. Logan that during the incident she could feel Mr. Kern's private parts against her. She contends that her sister, who also

participated in the telephone conversation, described that part of the incident to Mr. Logan. Mr. Logan told Plaintiff that he would look into her claim, but that before he could begin to investigate, he would need a written account of the incident and a list of witnesses. On January 16, 1996, Plaintiff delivered a written account of the incident to Mr. Logan.

On the same day that Mr. Logan received the notice from Plaintiff, he spoke with the employees who had worked the same shift and who were in the vicinity at the time of the training incident. Mr. Logan states that each employee who witnessed the incident reported that Mr. Kern first observed both Ms. Brandenburg and Plaintiff performing their job functions, then demonstrated how to pack the cartons, and then stood behind Plaintiff and moved her arms through the proper motions. The witnesses noted that Mr. Kern trained Ms. Brandenburg in the same manner. Mr. Logan also testified that none of the employees who saw the incident noticed any sign of protest from either Plaintiff or Ms. Brandenburg, and none of the witnesses believed Mr. Kern's actions to be sexual harassment in any way, shape or form. Many of these witnesses have offered affidavits to this effect in this action.

Mr. Logan testified that he concluded from his investigation that any problem between Plaintiff and Mr. Kern was most likely a misunderstanding. Nonetheless, he asked Mr. Christian to discuss the incident with Mr. Kern and to instruct Mr. Kern not to use that training technique again.

At all times relevant to this lawsuit, Defendant had in place an express policy which forbids all forms of discrimination, including sexual harassment. Plaintiff received a copy of that policy during her orientation with Defendant. Under this policy, Mr. Logan was designated as the sexual harassment "coordinator."

### 3. The First Discharge

Mr. Logan did not discuss the training incident with either Mr. Camp or Mr. Christian when he investigated the matter on January 16, 1995. The decision to terminate Plaintiff was made by Messrs. Christian and Camp before they knew of her complaint to Mr. Logan.[1] He states, however, that on that very day Mr. Camp informed him of the decision to terminate Plaintiff for her poor performance. Defendant has presented testimony that Plaintiff was slow, at times impeded production, and had difficulty following directions.

### 4. The Reinstatement

Plaintiff filed a grievance with her union after her termination. After a third step grievance meeting, Defendant and the union agreed to reinstate Plaintiff as a probationary employee effective April 4, 1995. For three to four weeks of her second probation term, Plaintiff worked as a feeder/takeoff in the lower warehouse. The machines in the lower warehouse run at a considerably slower speed than those in the upper warehouse. Mr. Camp assigned Plaintiff to work in the lower warehouse on the assumption that the slower pace would be helpful.

Gene Franklin was the lead person while Plaintiff was working in the lower warehouse. He describes performance problems during Plaintiff's second probationary term that are nearly identical to those discussed above. Mr. Franklin also states that he received complaints from people assigned to train Plaintiff and numerous and persistent complaints from employees assigned to work with her. Mr. Franklin complained of Plaintiff's performance to Mr. Camp and Mr. Christian on several occasions, and finally, because there were no supervisory personnel in the lower warehouse, asked that Plaintiff be transferred to the upper warehouse for closer evaluation.

After Plaintiff returned to the upper warehouse, Mr. Camp continued to receive com-

---

1. Plaintiff states that she disputes Defendant's contention that Mr. Logan had not yet informed Mr. Camp and Mr. Christian of Plaintiff's complaint when those individuals told him of their decision to terminate Plaintiff. The Magistrate Judge found, and this court agrees, however, that Plaintiff could not rely on her conclusory beliefs to show knowledge on the part of the relevant decision makers.

plaints regarding her performance. On May 9, 1995, Mr. Camp received a complaint from machine operator James Mote that Plaintiff was working so slowly that others had to cover for her. Specifically, Mr. Mote stated that she was working her co-employee, Nancy King, "to death." Mr. Camp then called Plaintiff into his office and gave her an evaluation. He informed Plaintiff that her performance was inadequate, and he informed her of the numerous complaints that he had received about her. Plaintiff acknowledged that her performance needed improvement and pleaded with Mr. Camp to allow her a chance to work a little harder. On May 12, 1995, however, Plaintiff was again terminated.

### B. *Procedural History*

Plaintiff filed this action on September 26, 1996. She claims that Defendant subjected her to hostile work environment sexual harassment and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff also brings a state law claim of intentional infliction of emotional distress.

On August 21, 1997, Jefferson Smurfit Corporation filed a motion for summary judgment in this action. On January 8, 1998, Magistrate Judge Brill issued a Report and Recommendation recommending that this motion be granted. Specifically, the Magistrate Judge found that Plaintiff was unable to show the final element of her prima facie case of hostile work environment sexual harassment—respondeat superior. In regard to Plaintiff's retaliation claim, Magistrate Judge Brill found that Plaintiff could not establish a causal link between the adverse employment action and her complaint of sexual harassment and therefore failed to establish a prima facie case. In the alternative, Magistrate Judge Brill found that Defendant had succeeded in stating a legitimate, non-discriminatory reason for Plaintiff's discharge, and that Plaintiff was not able to show that this reason was pretextual. Finally, because Magistrate Judge Brill dismissed Plaintiff's Title VII claims, she declined to exercise supplemental jurisdiction over the state law claim of intentional

infliction of emotional distress and dismissed that claim without prejudice.

Both parties have filed objections to this Report and Recommendation. Plaintiff objects to the Magistrate Judge's findings regarding her Title VII claims. Defendant, on the other hand, objects to Magistrate Judge Brill's decision not to exercise jurisdiction over the intentional infliction of emotional distress claim. Defendant argues that this claim is preempted by section 301 of the Labor Management Relations Act, and therefore the court has original jurisdiction. In the alternative, Defendant argues that the interests of judicial efficiency would be best served by the court exercising jurisdiction over this claim and dismissing it on the merits.

## II. DISCUSSION

### A. *Plaintiff's Objections*

Plaintiff's first objection is to the Magistrate Judge's reliance on the affidavits presented by Defendant in support of its motion for summary judgment. Plaintiff states that she is not in a position to respond to these affidavits due to the prohibitive cost of deposing numerous witnesses. Plaintiff further argues that because this case is before the court on a motion for summary judgment, all inferences of fact should be resolved in her favor. Thus, according to Plaintiff, the court improperly relied on Defendant's affidavits merely because the evidence was uncontradicted.

Pursuant to Fed.R.Civ.P. 56, however, when a motion for summary judgment is supported by proper affidavits, an adverse party may not rest upon mere allegations or denials, but must support her response by affidavits or other specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against that party. *See* Fed.R.Civ.P. 56(e); *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Magistrate Judge Brill's reliance upon Defendant's affidavits was therefore appropriate. While the court is

sympathetic to the high cost of litigation, Plaintiff, in order to avoid summary judgment, could have resorted to a less expensive means of discovery This objection is therefore without merit.

### 1. Sexual Harassment

■■■ Plaintiff's second objection is to the Magistrate Judge's finding that the anti-discrimination policy was sufficiently effective to preclude a finding of constructive knowledge on the part of Defendant. Under Title VII, there are two theories under which an employer can be liable for sexual harassment. First, where the alleged harasser is himself the Plaintiff's employer, or an agent of the employer, the company can be held directly liable. *See Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1561 (11th Cir.1987). Here, Plaintiff does not contend that Mr. Kern was acting as Defendant's agent and thus there is no direct liability. An employer can also be held indirectly liable, however, by showing that the employer knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action. *See Henson v. City of Dundee*, 682 F.2d 897, 910 (11th Cir.1982). Magistrate Judge Brill found that Plaintiff failed to show that Defendant should have known about the harassment before Plaintiff actually complained because Defendant maintained an effective anti-harassment policy. *See Faragher v. City of Boca Raton*, 111 F.3d 1530, 1535 (11th Cir.1997), *cert. granted*, —— U.S. ——, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997) (a finding that the company should have known of the harassment is precluded if that company has developed and promulgated an effective and comprehensive anti-sexual harassment policy). Plaintiff, however, challenges the efficacy of Defendant's policy because Mr. Kern testified that he was not aware of the policy, Mr. Kern never spoke to Mr. Logan about the training incident, and Mr. Kern was never disciplined for this incident. Even if this evidence did establish a question of fact as to the effectiveness of the policy, however, Plaintiff has still failed to show constructive knowledge. The showing of an effective anti-harassment policy is merely one method by which an employer can pre-vent a finding of constructive knowledge. Therefore, the fact that this method is not available here does not necessitate a finding of such knowledge. To demonstrate that the employer should have known about the alleged sexual harassment, Plaintiff must show that the conduct was so pervasive that an inference of constructive knowledge arises. *See Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 903 (11th Cir.1988).

In the instant case, the sum total of events took place in one shift and, even accepting Plaintiff's version of events, each incident only lasted a short period of time. Further, it is undisputed that many of the people who witnessed the incident did not perceive there to be a problem. Such facts do not demonstrate that Defendant should have been put on notice that Plaintiff was being harassed. Therefore, there was no constructive knowledge on the part of Defendant, and the question becomes whether Defendant took immediate and appropriate remedial measures once Mr. Logan received actual knowledge of the incident.

■■ The Magistrate Judge found that the actions taken by Mr. Logan were sufficient to preclude a finding of indirect liability. Plaintiff objects to this finding. Again, Plaintiff points to the fact that Mr. Kern was never actually disciplined, that Mr. Kern never spoke to Mr. Logan about the incident, and that Mr. Kern's conversations with Mr. Camp and Mr. Christian about this incident were not reduced to writing. On the same day Mr. Logan received Plaintiff's complaint, however, he initiated a thorough investigation of the incident. Mr. Logan interviewed numerous witnesses who saw the incident. All of these witnesses indicated that they did not believe that Mr. Kern was sexually harassing Plaintiff. In such circumstances, the fact that the accused harasser was never actually disciplined is not dispositive. As the Magistrate Judge correctly noted, the Eleventh Circuit has suggested that when an employer promptly investigates a claim of harassment and determines that there is no support for that claim, the investigation itself may constitute prompt remedial action. *See Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir.1996). Fur-

ther, in addition to conducting this investigation, Mr. Logan instructed Mr. Camp and Mr. Christian to speak with Mr. Kern and inform him that he must discontinue this training method. It is undisputed that Mr. Kern never again trained an employee in this manner. The court therefore finds that the remedial measures taken by Defendant were adequate, and Plaintiff cannot show liability for sexual harassment.

█ █ The court further finds that Plaintiff cannot establish that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create a hostile work environment." *Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In order to affect the conditions of employment sufficiently to implicate Title VII, conduct must create an environment that a reasonable person would find hostile or abusive and must be such that the plaintiff subjectively perceives the environment to be abusive. *Id.* In determining if an environment is hostile, the court must look to all of the circumstances. This includes the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the Plaintiff's work performance. *Id.*

█ In the instant case, it is clear that Plaintiff found the incident in question offensive. Not every offensive remark or action in the workplace, however, rises to the level of an objectively hostile work environment. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Here, neither the complained of conduct, nor any related conduct, was ever repeated. Plaintiff's allegations rest upon two short incidents in one shift. Further, it cannot be said that this conduct detracted from Plaintiff's job performance or prevented her from advancing at the company. Indeed, Plaintiff admits that prior to this incident, she was moving her arms in an improper manner. Not all physical contact between men and women engaged in manual labor can be avoided. While this conduct may have made Plaintiff uncomfortable, it does not rise to the level of creating a hostile work environment. Accordingly, the court OVER-RULES Plaintiff's objections and finds that summary judgment for Defendant on Plaintiff's sexual harassment claim is appropriate.

### 2. Retaliation

█ Plaintiff next objects to Magistrate Judge Brill's finding that she failed to establish a *prima facie* case of retaliation. In order to show a *prima facie* case of retaliation, Plaintiff must show that she engaged in statutorily protected activity, that she suffered an adverse employment action, and that there is a causal connection between this adverse action and her protected activity. *See Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1524 (11th Cir.1991). In an attempt to satisfy the causal link element of this test, Plaintiff pointed to the close proximity in time between her January 13 and January 16 complaints of sexual harassment and her January 18 termination. The Magistrate Judge concluded that, although the temporal connection between protected activity and the adverse action can sometimes lead to a weak inference of retaliation, this, standing alone, is not sufficient in the face of certain intervening factors. *See Gleason v. Mesirow Financial,* 118 F.3d 1134, 1147 (7th Cir. 1997); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3rd Cir.1997); *Robinson v. AFA Serv. Corp.,* 870 F.Supp. 1077, 1084 (N.D.Ga.1994) (Camp, J.). Specifically, the Report and Recommendation found that the employee complaints and supervisor observations of Plaintiff's poor performance were intervening factors that prohibited an inference of causation from the temporal proximity between Plaintiff's complaint and her two terminations. In her objections, Plaintiff argues that she has presented sufficient evidence to call into question these reports of poor performance and, therefore, should be considered to have established her prima facie case.

█ Regardless of whether Plaintiff successfully rebutted the complaints about her work performance, however, the court agrees with the Magistrate Judge that Plaintiff has failed to show a causal link with respect to the January 16 discharge. Plaintiff has presented no evidence which indicates that Mr. Camp and Mr. Christian knew

about Plaintiff's sexual harassment complaint when they initially informed Mr. Logan of their decision to terminate her. A plaintiff in a retaliation case must at least establish that the decision maker was aware of the protected expression at the time the alleged retaliatory action was taken. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993). Accordingly Plaintiff's objection on this point is unavailing as to the January 16 discharge.

Further, the court finds Plaintiff's objections unavailing as to the second discharge. Plaintiff points to the testimony in her deposition that three other employees told her that she was doing a good job and stated that they had told Mr. Christian the same thing. Plaintiff also offers the affidavit of Mr. Scott stating that Plaintiff did "a pretty good job" and that he had seen others perform worse, but no specific individuals were identified. In addition, Plaintiff states that Ms. Brandenburg performed at the same level and was retained. The statements of Plaintiff's coworkers as to her qualifications, however, do not shed any light on whether the employer honestly based the decision to terminate Plaintiff on her performance. *See Johnson v. City of Ft. Wayne, Indiana*, 91 F.3d 922, 936 (7th Cir.1996).

Further, Plaintiff contends that Ms. Brandenburg performed at the same level. Plaintiff relies upon two performance reports issued to Shelby Brandenburg. The first of these reports concerned several boxes packed by Ms. Brandenburg which were found to be missing glue. This one error does not constitute the type of systemic difficulties which are evidenced by the complaints about Plaintiff's performance. The second complaint was issued on May 17, 1995 and was therefore after both of Plaintiff's discharges and cannot be seen as relevant to any similarity between the two workers while Plaintiff was employed. Further, the May 17 memorandum explicitly states that during her probationary period Ms. Brandenburg showed a desire to learn and an effort to perform a good job. This statement stands in stark contrast to the numerous complaints about Plaintiff's performance during her probationary period. As Ms Brandenburg is not

sufficiently similar, Plaintiff has failed to establish a *prima facie* case of retaliation, and it is unnecessary to address Plaintiff's objections to the Magistrate Judge's findings about pretext. Accordingly, the court OVERRULES Plaintiff's objections and finds that the entry of summary judgment for Defendant on Plaintiff's retaliation claims is appropriate.

### B. *Defendant's Objections*

Defendant objects to Magistrate Judge Brill's decision to decline to exercise jurisdiction on Plaintiff's intentional infliction of emotional distress claim. Specifically, Defendant asserts that this claim is preempted by section 301 of the Labor Management Relations Act. Therefore, the court has original jurisdiction over this claim. Further, Defendant argues that because this claim is subject to section 301 of the Labor Management Relations Act, and Plaintiff failed to pursue her remedies under the collective bargaining agreement, the claim should be dismissed. In the alternative, Defendant argues that in the interest of judicial efficiency, the court should exercise jurisdiction over this claim and dismiss it on the merits.

Section 301 of the Labor Management Relations Act provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to citizenship of the parties.

29 U.S.C. § 185(a). Section 301 not only grants federal courts jurisdiction over employment disputes involving collective bargaining agreements, but also expresses a federal policy that the substantive law to apply in suits under this section is federal law, which the courts must fashion from the policy of our national labor laws. *See Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Further, if the resolution of a state law claim depends upon the meaning of a collective bargaining agreement, the application of state law is preempted, and federal labor law principles,

uniform throughout the nation, must be employed to resolve the dispute. *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 405–06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).

There are numerous cases which find that state law claims of intentional infliction of emotional distress are preempted where there is a possibility that the alleged conduct was authorized by the collective bargaining agreement. In such a circumstance adjudication of the state claim necessarily implicates the interpretation of the agreement. *See Baker v. Farmers Electric Co-op., Inc.*, 34 F.3d 274 (5th Cir.1994); *Humphreys v. PIE Nationwide, Inc.*, 723 F.Supp. 780 (N.D.Ga.1989) (Forrester, J.); *Van Meter v. Jefferson Smurfitt Corp.*, 1996 WL 640432, 69 E.P.D. (CCH) ¶ 44, 417 (N.D.Ga.1996) (Shoob, J.) (involving the same collective bargaining agreement at issue here). Such reasoning, however, is not applicable here.

Defendant argues that, because the collective bargaining agreement between the company and the Graphics Communications Union gives the company sole responsibility to direct its workforce and contains the union's agreement that employees will do their assigned work with and cooperate with their supervisors to improve the quality and quantity of production, this agreement explicitly governs training and any objections thereto. Therefore, according to Defendant, any determination regarding the reasonableness of Mr. Kern's training methods is substantially dependent upon an analysis of the terms of the collective bargaining agreement.

██ A number of courts have found, however, that while analysis of an employee's intentional infliction of emotional distress claim may at times require a court to refer to and interpret the contract provisions governing the terms and conditions of her employment, the extreme and outrageous character of certain sorts of employer conduct may be evident without a reference to the terms of the collective bargaining agreement. *See Lightning v. Roadway Express, Inc.*, 60 F.3d 1551 (11th Cir.1995). The same is true here. Whether Mr. Kern's physical contact with Plaintiff was outrageous can be determined without any recourse to the interpretation of

the collective bargaining agreement. Nor would such a determination interfere with the authority over training granted to Defendant in the cited portions of that agreement. Accordingly, the adjudication of her claim does not fall within the scope of section 301 preemption. *See Jackson v. Kimel*, 992 F.2d 1318, 1327 (4th Cir.1993); *Fox v. Parker Hannifin Corp.*, 914 F.2d 795 (6th Cir.1990).

Defendant also argues, however, that Plaintiff's intentional infliction of emotional distress claim is preempted, not because the alleged conduct is arguably authorized by the collective bargaining agreement, but rather because that conduct is expressly prohibited by both the agreement and state law. Because the collective bargaining agreement contains a provision expressly prohibiting sexual harassment, Defendant argues that any adjudication of Plaintiff's intentional infliction of emotional distress claim based upon this conduct is inextricably intertwined with an interpretation of this provision of the agreement.

In *Lingle*, however, the Supreme Court fount that:

> even if a dispute resolution pursuant to a collective bargaining agreement on the one hand and state law on the other hand would require addressing precisely the same set of facts, as long as the state law claim can be resolved without interpreting the agreement itself, the claim is independent of the agreement for section 301 preemption purposes.

*Lingle*, 486 U.S. at 410, 108 S.Ct. 1877. Under *Lingle*, therefore, if the rights of the Plaintiff are derived independently in state law, and a resolution of that state law claim would not require an interpretation of the terms of the agreement, there is no preemption.

In the instant case, in order for Plaintiff to succeed on a claim for intentional infliction of emotional distress, she must show: (1) the Defendant's conduct was extreme and outrageous; (2) the Defendant acted intentionally or recklessly; (3) the Defendant's conduct caused emotional distress; and (4) the resulting emotional distress was severe. *See Yarbray v. Southern Bell Telephone & Telegraph*

*Company*, 409 S.E.2d 835, 261 Ga. 703 (1991). Any litigation in which Mr. Kern's conduct was found to be "extreme and outrageous" would not necessarily preclude a finding that his conduct did not constitute harassment under the terms of the collective bargaining agreement. Similarly, any arbitration under the collective bargaining agreement which found that Mr. Kern's conduct constituted harassment would not necessarily dictate a finding that it was intentional infliction of emotional distress under Georgia law. In other words, the two claims are independent, and an adjudication of the intentional infliction of emotional distress claim does not require an interpretation of sexual harassment under the collective bargaining agreement. Accordingly, the court finds that Plaintiff's intentional infliction of emotional distress claim is not preempted by section 301 of the Labor Management Relations Act.

Defendant argues in the alternative that, in the interest of judicial efficiency, this court should exercise supplemental jurisdiction over Plaintiff's intentional infliction of emotional distress claim and dismiss that claim on the merits. The Supreme Court has stated, however, that needless decisions of state law should be avoided as a matter of comity. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c). Accordingly, the court OVERRULES Defendant's objections and ADOPTS that portion of the Report and Recommendation which declines to exercise jurisdiction over Plaintiff's intentional infliction of emotional distress claim.

## III. CONCLUSION

The court OVERRULES the objections of both parties and ADOPTS the Report and Recommendation as the Order of this Court. Accordingly, Defendant's motion for summary judgment [26-1] is GRANTED.